UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>      Plaintiffs,<br><br>vs.<br><br>DEREK L BITTNER D.C., P.C. d/b/a BITTNER CHIROPRACTIC CENTER; ELITE HEALTH CENTERS, INC.; ELITE CHIROPRACTIC, P.C.; ELITE REHABILITATION, INC.; MIDWEST MEDICAL ASSOCIATES, INC.; SUPERIOR DIAGNOSTICS, INC. d/b/a SUPERIOR IMAGING; D & M MANAGEMENT, LLC; DEREK BITTNER, D.C.; MARK RADOM; and NICOLE BITTNER, D.C.,<br><br>      Defendants. | Civil Action No. _____<br><br><br><br>**Demand for Jury Trial** |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.  <u>INTRODUCTION</u>

1.      This is a case about chiropractic clinics, physical therapy clinics, medical clinics, a magnetic resonance imaging ("MRI") facility, and the owners and representatives of the same who abused the unlimited benefits under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered and, if performed at all, were unlawful, were medically unnecessary, and were fraudulently billed.

2.      Defendants Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center ("Bittner Chiropractic"), Elite Health Centers, Inc. ("Elite Health"), Elite Chiropractic, P.C. ("Elite Chiropractic"), Elite Rehabilitation, Inc. ("Elite Rehab"), Midwest Medical Associates, Inc. ("Midwest"), Superior Diagnostics, Inc. d/b/a Superior Imaging ("Superior Imaging"), D & M Management, LLC ("D & M Management"), Derek Bittner, D.C. ("Derek Bittner"), Mark Radom ("Radom"), and Nicole Bittner, D.C. ("Nicole Bittner") (collectively, the "defendants") conspired to and did in fact defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.      The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act and Allstate policies of insurance for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

4.      The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were never actually provided to patients and manufactured documents to make it appear as though patients received treatment when, in fact, no such treatment was rendered.

5.      The defendants fraudulently incorporated non-profit entities to circumvent laws prohibiting chiropractors and laypersons from owning and controlling medical clinics and then used a so-called "management" company to charge the medical entities for bogus "management fees" in order to siphon the profits from these medical clinics.

6.      To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients and self-referred them within the defendants' network of commonly-owned clinics for unnecessary treatment and services.

7.      The defendants consistently provided unlicensed treatment and services, if provided at all, including massage therapy, chiropractic, and durable medical equipment ("DME").

8.     The treatment, when provided, was done as part of a predetermined protocol consisting of unreasonable and unnecessary chiropractic, physical therapy, injections, MRI scans, and massage therapy.

9.     The defendants also engaged in several fraudulent billing practices, including unbundling services so as to inflate the amount charged, upcoding office visits in order to charge Allstate for more services than were actually provided, and improperly billing for timed treatment modalities.

10.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

11.     Each of the defendants named herein conspired with one another to accomplish and further the objectives of their fraudulent scheme.

12.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

13.     The insurance fraud scheme perpetrated by the defendants was designed to, and in fact did, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

14.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their fraudulent scheme.

15.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

16.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, and Superior Imaging in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act; (2) treble damages; (3) statutory interest; (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants; and (5) attorney's fees.

17.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful treatment that was designed and implemented solely to increase their profits; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

18.    As a result of the defendants' fraudulent acts, Allstate has paid in excess of $763,951 to them related to the patients at issue in this Complaint.

## II.    <u>THE PARTIES</u>

### A.    <u>PLAINTIFFS</u>

19.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each corporations duly organized and existing under the laws of the State of Illinois.

20.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

21.    At all times relevant to the allegations in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.    <u>DEFENDANTS</u>

#### 1.    <u>Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center</u>

22.    Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center is a Michigan professional service corporation incorporated under the laws of the State of Michigan.

23.    Bittner Chiropractic is owned and controlled by defendant Derek Bittner, and Derek Bittner is responsible for all actions of Bittner Chiropractic described throughout this Complaint.

24.     Defendant Elite Health also participated in the control and operation of Bittner Chiropractic.

25.     Bittner Chiropractic's principal place of business is located in Sterling Heights, Michigan.

26.     Bittner Chiropractic billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

## 2.     Elite Health Centers, Inc.

27.     Elite Health Centers, Inc. is a Michigan non-profit corporation incorporated under the laws of the State of Michigan.

28.     Defendant Derek Bittner was the President and co-Director of Elite Health, and Derek Bittner is responsible for all actions of Elite Health described throughout this Complaint.

29.     Defendant Radom was the Vice President and co-Director of Elite Health, and Radom is responsible for all actions of Elite Health described throughout this Complaint.

30.     Defendants Bittner Chiropractic, Elite Chiropractic, Elite Rehab, D & M Management, and Nicole Bittner also participated in the control and operation of Elite Health.

31.    Elite Health's principal place of business was located in Sterling Heights, Michigan.

32.    Elite Health billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.    Elite Chiropractic, P.C.

33.    Elite Chiropractic, P.C. is a Michigan professional service corporation incorporated under the laws of the State of Michigan.

34.    Elite Chiropractic was owned and controlled by defendant Derek Bittner, and Derek Bittner is responsible for all actions of Elite Chiropractic described throughout this Complaint.

35.    Defendants Elite Health, Radom, and Nicole Bittner also participated in the control and operation of Elite Chiropractic.

36.    Elite Chiropractic's principal place of business was located in Sterling Heights, Michigan.

37.    Elite Chiropractic billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.    Elite Rehabilitation, Inc.

38.    Elite Rehabilitation, Inc. is a Michigan non-profit corporation incorporated under the laws of the State of Michigan.

39.    Defendant Derek Bittner was the President and co-Director of Elite Rehab, and Derek Bittner is responsible for all actions of Elite Rehab described throughout this Complaint.

40.    Defendant Radom was the Vice President and co-Director of Elite Rehab, and Radom is responsible for all actions of Elite Rehab described throughout this Complaint.

41.    Defendants Elite Health and D & M Management also participated in the control and operation of Elite Rehab.

42.    Elite Rehab's principal place of business was located in Sterling Heights, Michigan.

43.    Elite Rehab billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.    Midwest Medical Associates, Inc.

44.    Midwest Medical Associates, Inc. is a Michigan non-profit corporation incorporated under the laws of the State of Michigan.

45.     Defendants Superior Imaging, D & M Management, Derek Bittner, Radom, and Nicole Bittner participated in the control and operation of Midwest.

46.     Midwest's principal place of business is located in Sterling Heights, Michigan.

47.     Midwest billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.     Superior Diagnostics, Inc. d/b/a Superior Imaging

48.     Superior Diagnostics, Inc. d/b/a Superior Imaging is a Michigan non-profit corporation incorporated under the laws of the State of Michigan.

49.     Defendant Derek Bittner is the President and Director of Superior Imaging, and Derek Bittner is responsible for all actions of Superior Imaging described throughout this Complaint.

50.     Defendants Midwest, D & M Management, Radom, and Nicole Bittner also participated in the control and operation of Superior Imaging.

51.     Superior Imaging's principal place of business is located in Southfield, Michigan.

52.     Superior Imaging billed Allstate for diagnostic images that were unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.     D & M Management, LLC

53.     D & M Management, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

54.     Defendants Derek Bittner and Radom own and control D & M Management, and Derek Bittner and Radom are responsible for all actions of D & M Management described throughout this Complaint.

55.     D & M Management's principal place of business is located in Sterling Heights, Michigan.

56.     D & M Management allegedly provided "management services" to the defendant non-profit clinics, including Elite Health, Elite Rehab, Midwest, and Superior Imaging, as this was the only way Derek Bittner (a chiropractor) and Radom (a layperson) could obtain money from these purported non-profits.

57.     D & M Management was responsible for the unlawful and medically unnecessary services rendered (to the extent they were rendered at all) to the patients at issue in this Complaint by and through Elite Health, Elite Rehab, Midwest, and Superior Imaging, including the patients listed in Exhibits 2, 4, 5, and 6.

### 8. Derek Bittner, D.C.

58. Derek Bittner, D.C. is a resident and citizen of the State of Michigan.

59. At all times relevant to this Complaint, Derek Bittner owned and controlled Bittner Chiropractic and Elite Chiropractic and controlled and derived profits from Elite Health, Elite Rehab, Midwest, and Superior Imaging, including but not limited to his control of these clinics by and through his company D & M Management.

60. As the owner and manager of Bittner Chiropractic and Elite Chiropractic, Derek Bittner was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1 and 3.

61. As the owner and manager of D & M Management, Derek Bittner was responsible for the unlawful and medically unnecessary services rendered (to the extent they were rendered at all) to the patients at issue in this Complaint by and through Elite Health, Elite Rehab, Midwest, and Superior Imaging, including the patients listed in Exhibits 2, 4, 5, and 6.

### 9. Mark Radom

62. Mark Radom is a resident and citizen of the State of Arizona.

63. At all times relevant to this Complaint, Radom controlled and derived profits from Elite Health, Elite Rehab, Midwest, and Superior Imaging, including

but not limited to his control of these clinics by and through his company D & M Management.

64.    As the owner and manager of D & M Management, Radom was responsible for the unlawful and medically unnecessary services rendered (to the extent they were rendered at all) to the patients at issue in this Complaint by and through Elite Health, Elite Rehab, Midwest, and Superior Imaging, including the patients listed in Exhibits 2, 4, 5, and 6.

### 10.    Nicole Bittner, D.C.

65.    Nicole Bittner, D.C. is a resident and citizen of the State of Connecticut.

66.    At all times relevant to this Complaint, Nicole Bittner participated in the control and operation of Elite Health, Elite Chiropractic, Midwest, and Superior Imaging.

## III.    JURISDICTION AND VENUE

67.    Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

68.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

69.    Allstate is a citizen of the State of Illinois for purposes of 28 U.S.C. § 1332.

70.    Derek Bittner is a resident and citizen of the State of Michigan.

71.     Radom is a resident and citizen of the State of Arizona.

72.     Nicole Bittner is a resident and citizen of the State of Connecticut.

73.     Bittner Chiropractic is a corporation organized under the laws of the State of Michigan.

74.     Bittner Chiropractic's principal place of business is in Michigan.

75.     Thus, Bittner Chiropractic is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

76.     Elite Health is a corporation organized under the laws of the State of Michigan.

77.     Elite Health's principal place of business was in Michigan.

78.     Thus, Elite Health is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

79.     Elite Chiropractic is a corporation organized under the laws of the State of Michigan.

80.     Elite Chiropractic's principal place of business was in Michigan.

81.     Thus, Elite Chiropractic is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

82.     Elite Rehab is a corporation organized under the laws of the State of Michigan.

83.     Elite Rehab's principal place of business was in Michigan.

84.     Thus, Elite Rehab is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

85.     Midwest is a corporation organized under the laws of the State of Michigan.

86.     Midwest's principal place of business is in Michigan.

87.     Thus, Midwest is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

88.     Superior Imaging is a corporation organized under the laws of the State of Michigan.

89.     Superior Imaging's principal place of business is in Michigan.

90.     Thus, Superior Imaging is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

91.     D & M Management is a limited liability company organized under the laws of the State of Michigan.

92.     D & M Management's principal place of business is in Michigan.

93.     The sole members of D & M Management are Derek Bittner and Radom, neither of whom are residents or citizens of the State of Illinois.

94.     Thus, each defendant is completely diverse from Allstate for purposes of 28 U.S.C. § 1332.

95.    Further, the amount in controversy, exclusive of interest and costs, relative to each defendant exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

96.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    MICHIGAN'S NO-FAULT ACT

97.    Allstate underwrites automobile insurance in Michigan.

98.    Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

99.    Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Id.

100.    "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent that it is not a reasonable charge for a particular product or service, or if the product or service itself is not reasonably necessary." Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

101.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary, the charge for the service is reasonable, and the expense is incurred.  Id.

102.   Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

103.   The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

104.   "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 310 (1992).

105.   The Michigan No-Fault Act further provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."  Mich. Comp. Laws § 500.3148(2).

106.   As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting and causing to be submitted bills to Allstate seeking reimbursement for services and treatment that were not actually provided, were not lawfully rendered, and were not reasonably necessary for the care, recovery, or rehabilitation of patients.

## V.   BACKGROUND ON DEFENDANTS AND THEIR SCHEME

107.   The defendants have a long history of fraud involving healthcare providers, lawyers, and familial connections.

108.   As discussed in more detail *infra*, Derek Bittner and Radom listed family members on corporate filings for many of the defendant clinics in an attempt to hide their personal involvement.

109.   Derek Bittner and his sister, Nicole Bittner, coordinated to provide excessive chiropractic treatment (if provided at all) and refer patients for unnecessary MRI scans.

110.   Radom coordinated with his former brother-in-law, Michigan personal injury attorney Michael Morse ("Morse"), and his college friend, Jayson Rosett ("J. Rosett"), to solicit motor vehicle accident victims for legal representation and unnecessary medical treatment at clinics owned and controlled by Radom and Derek Bittner.

111.   Derek Bittner and Radom developed a scheme that benefitted themselves and their family members by enabling them to initiate legal claims (e.g., Morse), as well as profit from providing unnecessary treatment (e.g., Nicole Bittner).

A.   OBTAINING AND USING UNAPPROVED POLICE REPORTS

112.   Radom attended the University of Arizona with Morse, J. Rosett, and personal injury attorney Ron Applebaum ("Applebaum").

113.   J. Rosett's father, Robert Rosett ("R. Rosett"), introduced J. Rosett to Antonio Spratt ("Spratt"), who was able to procure unapproved police reports from Detroit Police Department Officers Robert and Javay Coleman, who are husband and wife.  *See* Exhibit 7.

114.   The unapproved police reports were made available to the Rosetts before the reports were publicly available as an approved police report.

115.   By and through the unapproved police reports, the Rosetts had initial access to motor vehicle accident victims and thus a competitive advantage in order to solicit the victims for legal or medical services before any other person or provider.

116.   J. Rosett knew that he should not have access to the unapproved police reports.

117.   J. Rosett contacted Applebaum in 2009, brought the unapproved police reports to him, and told Applebaum how he got the reports.  Applebaum advised J.

Rosett that the reports were useful to contact automobile accident victims to solicit them as clients.

118.  J. Rosett paid Spratt $20 per unapproved police report or about $1,000 per week.

119.  Applebaum knew that J. Rosett had to purchase the unapproved police reports.

120.  Applebaum and personal injury attorney Cy Weiner ("Weiner") paid J. Rosett for the reports.  Some of the payments from Weiner and Applebaum were disguised as attorney referral fees and were directed to J. Rosett's brother, Ryan Rosett, Esq.

121.  Applebaum and Weiner paid Ryan Rosett, Esq. about $20,000 in bogus "referral" fees that were really payment for the unapproved police reports.

122.  Later, Weiner advised J. Rosett to provide the unapproved police reports to Scott Zack, D.C. ("Zack").

123.  On May 24, 2018, Zack was indicted by the United States for violating federal law by making bank withdrawals in reduced increments in order to avoid filing Currency Transaction Reports ("CTRs").  *See* United States v. Katz, Case No. 4:18-cr-20368-MFL-SDD, *Docket No. 1*.

124.  Zack made these withdrawals to pay an individual for soliciting motor vehicle accident victims for medically unnecessary treatment.  Id.

125.   On July 18, 2018, Zack pleaded guilty to one count of structuring a financial transaction to avoid bank reporting requirements in violation of 31 U.S.C. § 5324.   *See* id., *Docket No. 35*.   In doing so, Zack admitted to making cash withdrawals in an attempt to evade filing CTRs.   Id.

126.   After dropping off the unapproved police reports at Zack's clinic, J. Rosett realized how profitable billing No-Fault insurers could be when using these reports.

127.   Thereafter, J. Rosett opened a series of physical therapy clinics to bill No-Fault insurance: Michigan Center for Physical Therapy, Inc., Oak Park Center for Physical Therapy, Inc., and Dearborn Center for Physical Therapy, LLC.

128.   Prior to opening his physical therapy clinics, J. Rosett had no training related to physical therapy and never worked in any medical, chiropractic, or physical therapy clinic.

129.   In 2009, J. Rosett reconnected with Radom.

130.   J. Rosett informed Radom that he owned a physical therapy clinic.  Radom suggested that J. Rosett meet his (Radom's) brother-in-law, Morse, who could help him obtain patients for his clinic.

131.   Shortly thereafter, J. Rosett met Morse at the Beverly Hills Grill.

132.   During that meeting, J. Rosett informed Morse that he had a connection to procure unapproved police reports from the Detroit Police Department.

133.   Morse advised J. Rosett to contact his law firm's marketing director, Janet Rosenberg ("Rosenberg"), regarding the firm's use of the unapproved police reports.

134.   In addition, an attorney at Morse's firm, Anthony "Tony" Chapman ("Chapman"), also received unapproved police reports from J. Rosett.

135.   Morse instructed Rosenberg and Chapman to manage the solicitation and referrals to Morse's law firm using the unapproved police reports.

136.   J. Rosett always sent the unapproved police reports to Morse's law firm via e-mail (to Rosenberg or Chapman) or dropped off hard copies at the firm's office.

137.   When hand-delivering the unapproved police reports at Morse's office, J. Rosett either dropped them off to "Jamie" at the front desk or texted Rosenberg to retrieve them.

138.   Morse's firm performed "intake" of the individuals identified in the official police reports, and J. Rosett communicated with the firm to see where the referrals received treatment.

139.   J. Rosett wanted Morse, Rosenberg, and Chapman to refer the automobile accident victims identified in the unapproved police reports to his physical therapy clinics so J. Rosett could bill automobile insurers like Allstate.

140.   J. Rosett communicated regularly with Rosenberg and Chapman about the unapproved police reports.

141. Chapman sent J. Rosett lists of "clients signed/referred from police reports" and identified the client's medical provider. *See, e.g.,* Exhibit 8.

142. J. Rosett also communicated with Morse directly about the unapproved police reports.

143. For example, J. Rosett e-mailed Morse on September 14, 2011 asking Morse if "you want me to drop off reports tomorrow and Friday." Morse replied, "Yes. Bring them over." *See* Exhibit 9.

144. Morse knew that the police reports were unapproved and that it was illegal for him and his firm to obtain them because the reports were stamped "Unapproved Report" on every page. *See* Exhibit 10.

145. Morse was fully aware of his law firm's scheme to solicit individuals from the unapproved police reports for legal representation.

146. In fact, Morse kept a close eye on the number of clients obtained by soliciting motor vehicle accidents by and through the unapproved police reports.

147. For example, Morse e-mailed J. Rosett on November 18, 2011 to inform him that "[l]ast week we averaged 40 a day. This week, we averaged 26 per day. FYI. Thanks!" *See* Exhibit 11.

148. In late 2010, J. Rosett and the Colemans removed Spratt from the process of obtaining the unapproved police reports. *See* Exhibit 12.

149. J. Rosett began paying Javay Coleman directly in cash for the unapproved police reports.

150. J. Rosett's relationship with the Colemans eventually ended in late 2010 because the Colemans lost access to the unapproved police reports.

151. Around late 2010, R. Rosett retained two (2) other police officers, Carol Almeranti ("Almeranti") and Karen Miller ("Miller"), to obtain unapproved police reports.

152. R. Rosett obtained the reports from Almeranti and Miller and sent them to J. Rosett, who then gave them to Rosenberg at Morse's law office.

153. J. Rosett told Radom that he needed to get cash for his father to pay Almeranti and Miller for the unapproved police reports.

154. Morse and Radom instructed J. Rosett to create an entity through which they could transfer money to pay R. Rosett for obtaining the unapproved police reports.

155. J. Rosett formed the Accident Information Bureau LLC ("AIB") as a pass-through entity to pay his father for the unapproved police reports.[1]

---

[1] J. Rosett and defendants Radom and Derek Bittner used two entities interchangeably: Accident Information Bureau LLC and Accident Information Bureau of Michigan, LLC. For purposes of this Complaint, any and all references to "AIB" include both entities.

156.   Radom and Derek Bittner were the catalyst for AIB so that they had an entity through which they could channel money as payment for the unapproved police reports.

157.   J. Rosett began personally soliciting people identified on the unapproved police reports and referring them to Morse's firm for legal representation.

158.   In September 2010, Morse installed and paid for a phone in the AIB office and wired it to Morse's law firm's network, which allowed AIB to connect solicited patients directly to Morse's office:

**To:**      Jayrosett@gmail.com[jayrosett@gmail.com]
**From:**    Janet Rosenberg
**Sent:**    Tue 9/14/2010 2:38:53 PM
**Subject:** phone stuff

Ok so I talked to our phone guys again. For about $215 we can connect you right to our office with your own direct dial number so our name won't come up on caller ID.  If you're good with that, I will call Doug and make it happen!
Thanks,
J

Jan Rosenberg
Marketing/New Business Development
Law Office of Michael Morse, P.C.

*Fig. 1 (e-mail from Rosenberg to J. Rosett)*

159.   Morse's office, by and through Rosenberg, proposed the idea of the phone line to J. Rosett.

160.   Around late 2010 or early 2011, Radom met Derek Bittner after going to Bittner Chiropractic to conduct so-called "marketing" services on behalf of Plaintiff Investment Funding, LLC ("PIF"), which is owned by Todd Franklin

("Franklin"), and provides litigation funding to individuals involved in motor vehicle accidents.

161.   Morse referred his firm's clients to PIF and Franklin to obtain these loans.

162.   Franklin hired Radom (Morse's brother-in-law) to purportedly perform marketing services for PIF when the payments were in fact made to Radom to ensure that Morse continued using Franklin's services by and through PIF.

163.   Radom introduced Derek Bittner to Morse.

164.   On January 5, 2011, Morse contacted Keith Soltis, Esq. ("Soltis") and informed him that he "met a chiro today who was asking a lot of health law questions and taking advice from attorneys who don't know shit.  I would like you to help him." *See* Exhibit 13.

165.   Derek Bittner is the "chiro" with whom Morse met.

166.   Around the same time that Derek Bittner and Radom formed the Elite entities (discussed in further detail *infra*), Morse contacted J. Rosett about continuing their solicitation and referral scheme through AIB and the unapproved police reports.

167.   On August 12, 2011, Morse e-mailed J. Rosett about obtaining police reports, writing "[l]et's do the police report thing.  Just get them to me and I will get you more active treating patients.  It will work." *See* Exhibit 14.

168. Derek Bittner and Radom were fully aware of J. Rosett's ability to obtain unapproved police reports and solicit motor vehicle accident victims.

169. In fact, Derek Bittner, Radom, and Nicole Bittner coordinated with J. Rosett on cities and towns to target when soliciting individuals for unnecessary treatment at the Elite entities.

170. For example, Derek Bittner e-mailed J. Rosett on September 7, 2011 with a list of "locations that we can pull from," and that he "look[s] forward to working with you, it's going to be fun." *See* Exhibit 15.

171. Nicole Bittner also sent Derek Bittner a list of cities and towns, which he then forwarded to Radom, and Radom sent to J. Rosett. *See* Exhibit 16.

172. Morse, Radom, Derek Bittner, and J. Rosett developed a system to ensure that individuals solicited from the unapproved police reports received unnecessary treatment at the Elite entities.

173. First, J. Rosett, by and through AIB, used the unapproved police reports to solicit motor vehicle accident victims to Morse's law firm.

174. Morse then referred the solicited client(s) to Elite Chiropractic for chiropractic treatment.

175. Elite Chiropractic then referred the patients to Elite Health for pain management services, including injections.

176.   Elite Health prescribed physical therapy that was performed at J. Rosett's clinics, Elite Rehab, or an entity operating under an assumed name of Elite Health (i.e., Rehabilitation of Detroit or Rehabilitation of Sterling Heights).

177.   Including physicians as part of the defendants' scheme was necessary in order to refer patients for physical therapy under Michigan law.

178.   Prior to January 1, 2015, all physical therapy had to be first prescribed by a licensed physician.  Mich. Comp. Laws § 333.17820(1).

179.   On or after January 1, 2015, physical therapy treatment lasting more than twenty-one (21) days or ten (10) treatment sessions (whichever occurs first) requires a prescription from a physician.  Id.

180.   The defendants used Elite Health to provide these fraudulent physical therapy prescriptions, which allowed Elite Rehab and Elite Health to bill Allstate for excessive physical therapy.

181.   The Elite entities also consistently referred patients to Horizon Imaging LLC ("Horizon") for unnecessary MRI scans.

182.   Radom possessed an ownership interest in Horizon.

183.   Bank records from Horizon include payments of $200,000 to Radom.

184.   These checks were often paid in increments of $30,000 and listed as "marketing" or "advertising" expenses, but were really payments to Morse (by and

through his brother-in-law Radom) in exchange for his law firm sending its clients to Horizon.

185.   In 2012, Radom and Derek Bittner became more involved in the management of AIB and the solicitation scheme.

186.   Derek Bittner e-mailed Radom on May 31, 2012 with the subject "Call center send to jay" listing notes from a meeting held the day before with J. Rosett, Radom, and Derek Bittner that included "Call center," "Non-profit company," and "Accident information bureau."  *See* Exhibit 17.

187.   One week later, Derek Bittner contacted multiple chiropractors at Elite Chiropractic to inform them that "[o]ver the next days we are starting a mass marketing blitz" and stressing the importance of referring patients to Morse for legal representation.  *See* Exhibit 18.

188.   The "mass marketing blitz" Derek Bittner mentioned was the use of AIB as a call center to solicit motor vehicle accident victims for legal representation with Morse and unnecessary treatment at the Elite entities.

189.   On October 30, 2012 and December 21, 2012, Radom sent J. Rosett documents titled "PATIENT CALL SCRIPT1" on AIB letterhead.  *See* Exhibit 19.

190.   This document was a script for AIB employees to use when soliciting motor vehicle accident victims.

191.   Radom and Derek Bittner created the letterhead and the call script.

192.   The AIB script sent by Radom to J. Rosett falsely states that AIB is a "Non Profit Organization dedicated to the assessment and documentation of vehicle accidents and arranging adequate medical care and legal representation for the victims:"



## Accident Information Bureau

State of Michigan Non Profit Organization dedicated to the assessment and documentation of vehicle accidents and arranging adequate medical care and legal representation for the victims.

*Fig. 2 (letterhead of AIB patient call script)*

193.   AIB, in fact, was not a non-profit corporation, but falsely held itself out as such to trick alleged motor vehicle accident victims.

194.   The script instructed AIB employees on how to solicit motor vehicle accident victims, including:

> We're not the insurance companies, so don't worry; we're a non profit here to help you.
>
> We will provide those things at no cost to you and provide you with transportation to and from any and all doctor office visits, and like I said, all at no cost to you!
>
> We can arrange an appointment at the closest doctor's office to you that participates in the program and make you an appointment that [is] convenient for you, as well as arrange transportation for you if you so desire.   Fair enough?   How about I have someone to you in an hour or so?

Id.

195.   Radom and Derek Bittner also approved flyers advertising AIB's solicitation. *See* Exhibit 20.

196.   Derek Bittner recommended including a testimonial and "something about care!  Is your doctor getting you out of pain!"  Id.  This testimonial was made up.

197.   AIB established a "pay scale schedule" where the solicitor received money for every Morse client and Elite entity patient the AIB solicitor generated.

198.   Derek Bittner and Radom authorized J. Rosett to pay the AIB solicitors only after confirming that the solicited patients presented to the clinics.

199.   For example, Derek Bittner informed J. Rosett that it was "[g]ood to pay" the AIB solicitor after confirming that a list of patients presented for treatment at the Elite entities.  *See* Exhibit 21.

200.   Derek Bittner and Radom were also involved in hiring solicitors on behalf of AIB.

201.   For example, Derek Bittner sent Radom a job posting on Craigslist and created an email address, with the password "Marketing," for J. Rosett to use for responses to the post.  Radom then forwarded the e-mail to J. Rosett.  *See* Exhibit 22.

202.   AIB hired Mike Ryan ("Ryan") as a solicitor through the Craigslist post created by Derek Bittner.

203.   AIB paid Ryan to solicit motor vehicle accident victims through use of the unapproved police reports, and paid him through his company, "Synergy Payment Consulting."

204.   Ryan communicated directly with Derek Bittner and Radom about soliciting motor vehicle accident victims.

205.   For example, Ryan told J. Rosett on May 31, 2013 that he created an email account "based upon what Derrick [sic] Bittner requested."  *See* Exhibit 23.

206.   AIB also used runner Fred Schwarze ("Schwarze") to pick up solicited patients and drive them to the Elite entities.

207.   Schwarze received copies of unapproved police reports from J. Rosett and provided J. Rosett with spreadsheets of Elite entity patients obtained through AIB.  *See* Exhibit 24.

208.   Schwarze also e-mailed Derek Bittner and Radom with lists of AIB "patients."  *See* Exhibit 25.

209.   AIB made regular payments to FS Investments L.L.C. ("FS Investments") between July 2012 and April 2013 totaling $31,550.

210.   Schwarze is the organizer, resident agent, and managing member of FS Investments.

211.   Schwarze sent FS Investments invoices to J. Rosett for services provided on behalf of AIB.  *See* Exhibit 26.

212.   Derek Bittner and Radom were aware of these services, as J. Rosett forwarded the invoices to them.  Id.

213.   On February 25, 2013, Rosenberg e-mailed J. Rosett about Morse's law firm having issues with the unapproved police reports.  *See* Exhibit 27.

214.   According to Rosenberg, the gap between receiving the unapproved (i.e., illegal) police reports from J. Rosett and the official (i.e., legal) police reports was too long and caused issues with the mailed advertisements that Morse sent to solicited clients because "we send them out the day you send to us, and then people call to respond to our letter saying WE HAVE YOUR POLICE REPORT, and we don't have it and can't look it up."  Id.

215.   In early 2013, Rosenberg instructed J. Rosett to stop sending the unapproved police reports and rather to cull the necessary information from the unapproved police reports and populate a spreadsheet, which was sent to Rosenberg.

216.   J. Rosett sent the spreadsheets detailing the information from the unapproved police reports only to Rosenberg.  He sent them every weekday when there was something to send.

217.   In fact, when asked by Rosenberg at one point if there were "[n]o reports today?," J. Rosett responded, "YES reports everyday!!"  *See* Exhibit 28.

218.   AIB and J. Rosett were paid by the Elite entities.  AIB never received money from any entity other than Radom's and Derek Bittner's clinics.

219.   The Elite entities wired money to AIB for patients solicited by AIB for the benefit of Morse, Radom, and Derek Bittner, and their law firm and clinics.

220.   The Elite entities wired approximately $2,000 to AIB every week or every other week in exchange for the unapproved police reports.

221.   AIB then issued checks to 2875 Maple L.L.C. ("2875 Maple"), which was a shopping center operated by R. Rosett, as a means to launder payment for the unapproved police reports.

222.   AIB paid hundreds of thousands of dollars to 2875 Maple for procurement of unapproved police reports to solicit auto accident victims.

223.   Almeranti and Miller had ATM cards for a 2875 Maple bank account.  This allowed them to withdraw monies representing payment for illegal procurement of unapproved police reports.

224.   J. Rosett and R. Rosett continued receiving unapproved police reports from Almeranti and Miller until at least January 2016.  *See* Exhibit 29.

225.   Morse never paid J. Rosett or AIB directly for the unapproved police reports.

226.   Instead, J. Rosett's physical therapy clinics were paid by Morse through the referrals of Morse's clients to J. Rosett's clinics and the settlement of patients' No-Fault claims.  Morse never provided a breakdown of the settlement to J. Rosett, but rather demanded that J. Rosett accept whatever amount Morse directed to him in exchange for continued referrals of Morse's clients to J. Rosett's physical therapy clinics.

227.   Morse paid what he wanted to pay without any regard to the outstanding physical therapy bills.  J. Rosett had no choice but to accept the amount identified by Morse because disputing the amount would lead to losing Morse's referrals to J. Rosett's physical therapy clinics.

228.   Morse told J. Rosett to pay for Morse's personal expenses in exchange for referrals to his physical therapy clinics.

229.   Morse also demanded of J. Rosett campaign donations to judges in exchange for referrals to his physical therapy clinics.

230.   In 2015, Morse told J. Rosett to pay Morse's contractors $88,000 for work on Morse's personal residence in exchange for referrals to J. Rosett's physical therapy clinics.

231.   Morse also instructed J. Rosett to purchase time on his private aircraft, including payment of $100,000 to Morse's private aircraft company, JEL Aircraft Leasing, LLC.

232.   In 2017, Morse asked J. Rosett and Radom to meet him at Little Caesar's Arena to buy a suite for $500,000 per year.  Morse wanted Radom and J. Rosett to pay for the suite in exchange for referring his clients to their clinics for treatment.

### B.   FORMATION OF THE ELITE ENTITIES

233.   Soltis assisted Radom and Derek Bittner in establishing defendants Elite Chiropractic, Elite Health, and Elite Rehab (collectively, the "Elite entities").

234.   Radom and corporations associated with him, including HI Investor LLC, contributed financially to the Elite entities shortly after their incorporation.

235.   Derek Bittner is the sole officer of Elite Chiropractic.

236.   Corporate records filed with the State of Michigan for both Elite Health and Elite Rehab identify Derek Bittner as the President, Radom as the Vice President, and Ryan Bittner, D.C. ("Ryan Bittner") (Derek Bittner's wife) as the Secretary.

237.   Corporate records filed with the State of Michigan for Elite Rehab also identify Amy Radom (Radom's ex-wife) as a Director.

238.   Corporate records filed with the State of Michigan in 2012 for Elite Health identify Stig Aronsson as a Director.

239.   Radom listed Stig Aronsson as a creditor in his 2009 bankruptcy.

240.   These three (3) Elite entities operated out of locations in Sterling Heights and Detroit, and were located within the same office at both of those locations.

241.   Elite Health operated under multiple assumed names: (1) Pain Specialists of Michigan; (2) Pioneer Neurology Group; (3) Prime Neurosurgery Group; (4) Rehabilitation of Detroit; and (5) Rehabilitation of Sterling Heights.

242.   As discussed in more detail *infra*, Derek Bittner and Radom established a system of improper inter-referrals through a predetermined treatment protocol that ensured all patients received treatment from at least two (2) and usually all three (3) of the Elite entities.

243.   Derek Bittner falsely testified that he was not affiliated with Elite Health and similarly denied any affiliation with Elite Rehab to hide his fraud.

244.   As discussed *supra*, Derek Bittner is identified in corporate filings as President of Elite Health and Elite Rehab.

245.   The website for the Elite entities identified Derek Bittner as one of the "Doctors" at Elite Health.  *See* Exhibit 30.

246.   Derek Bittner also received e-mails, at an Elite Health e-mail address, from Elite Rehab employees about referrals:

**From:** Dominika Liptakova <DLiptakova@elitehealthcenters.com>
**Date:** June 25, 2012 12:56:17 PM EDT
**To:** Derek Bittner <DBittner@elitehealthcenters.com>

Here is what I have referred out to them so far.

Have a good day,

## *Dominika Liptakova*

*Physical Therapy Coordinator*

*Elite Rehabilitation, Inc*

Fig. 3 (E-mail from Elite Rehab employee to Derek Bittner)

247. An Elite Health employee also included both Derek Bittner and Radom on an e-mail to staff at the Elite entities containing a list of "Elite Health Centers Locations." *See* Exhibit 31.

248. The list identified Derek Bittner as the contact for the Sterling Heights offices. Id.

249. The list also included Radom's name and cell phone number. Id.

250. As discussed in more detail *infra*, Derek Bittner and Radom fraudulently incorporated Elite Health and Elite Rehab as non-profit entities because a chiropractor (i.e., Derek Bittner) and a layperson (i.e., Radom) cannot control a

medical clinic with pain management physicians.  *See* Mich. Comp. Laws § 450.1284.

251.  Derek Bittner and Radom formed D & M Management on or about July 21, 2011.

252.  D & M Management is a self-described management company used by Derek Bittner and Radom to pull profits out of the Elite "non-profit" entities under the guise of alleged "management fees."

253.  A January 22, 2016 order as part of Radom's divorce proceedings identified D & M Management as his source of income.  *See* Exhibit 32.

254.  D & M Management has the same address as the Sterling Heights location of the Elite entities and Midwest.

255.  Starting in 2013, Derek Bittner and Radom took active steps to conceal their ownership of Elite Health and Elite Rehab.

256.  Elite Health and Elite Rehab both filed their 2013 annual statements with the State of Michigan on January 17, 2014.

257.  Both Elite Health and Elite Rehab changed their President from Derek Bittner to George Ingham, who is Derek Bittner's father-in-law.

258.  Both Elite Health and Elite Rehab changed their Vice President from Radom to Brenda Sher, who was the office manager of the Elite entities.

259.   Both Elite Health and Elite Rehab suddenly had identical Directors: Matt Fishburn, Lowell Friedman, and Franklin.

260.   Upon information and belief, Matt Fishburn is a high school physical education teacher.

261.   Lowell Friedman is a criminal defense and family law attorney.

262.   Franklin, as discussed *supra*, owns PIF and previously hired Radom to perform alleged marketing services.

263.   Franklin testified that Radom asked him to be a director of Elite Health.

264.   When asked for his understanding of his responsibilities as a director of Elite Health (an alleged non-profit), Franklin testified, "[h]ave steaks, go out and have dinner and talk about business."

265.   Franklin testified further that he was not aware that he was a director of Elite Rehab and denied ever being asked to be a director of Elite Rehab:

> Q.   Do you know why – and are you also aware that you've been identified as a director of Elite Rehabilitation, Inc.?
>
> A.   No.
>
> Q.   Nobody ever asked you to be a director of Elite Rehabilitation, Inc.?
>
> A.   Not that I know of.

266.   Soltis, the attorney who incorporated the Elite entities on behalf of Derek Bittner and Radom, testified that "the directors are the ones who have the ultimate authority and make all the decisions for the nonprofit."

267.   Franklin testified that he did not make any decisions on behalf of Elite Health.

268.   Moreover, Franklin did not make decisions on behalf of Elite Rehab as he did not even know that he was a director.

269.   Around February 2013, Derek Bittner and Radom stopped billing Allstate for physical therapy under Elite Rehab and began billing under assumed names for Elite Health: Rehabilitation of Detroit and Rehabilitation of Sterling Heights.

270.   For example, Allstate received bills from Elite Rehab until February 6, 2013 for Patient M.V. (Claim No. 0251923728).[2]

271.   Beginning on February 12, 2013, Allstate began receiving bills from Rehabilitation of Sterling Heights for Patient M.V.

272.   The treatment purportedly provided by Rehabilitation of Sterling Heights was performed by the same physical therapists out of the same office location as Elite Rehab.

---

[2] To protect the confidentiality of its insureds, Allstate refers to them throughout this Complaint by initials and claim numbers.

273.   Elite Health also began billing Allstate under the assumed names Pioneer Neurology Group, Prime Neurosurgery Group, and Pain Specialists of Michigan.

274.   Derek Bittner and Radom used these assumed names in an attempt to conceal the self-referrals by making it appear that patients received services from entities that were not named "Elite."

## C.   TRANSITION FROM THE ELITE ENTITIES TO MIDWEST AND SUPERIOR IMAGING

275.   In 2014, Derek Bittner and Radom transitioned their scheme from the Elite entities to newly formed entities: defendants Midwest and Superior Imaging.

276.   Derek Bittner and Radom submitted the Articles of Incorporation for Midwest and Superior Imaging to the State of Michigan within two (2) minutes of each other.

277.   Midwest performed chiropractic and pain management treatment, and replaced Bittner Chiropractic, Elite Chiropractic, and Elite Health.

278.   Superior Imaging performed MRI scans and replaced Horizon.

279.   Derek Bittner and Radom again formed these entities as non-profit corporations in order to circumvent Michigan's legal restrictions that prohibit a chiropractor and layperson from owning and controlling these types of medical clinics.

280.   As with the Elite entities, Derek Bittner and Radom continued using D & M Management to pull the profits out of these two (2) "non-profits" through supposed "management" fees.

281.   Derek Bittner and Radom attempted to conceal their involvement by listing Jennifer Sabo as the incorporator and resident agent for the entities.

282.   However, Derek Bittner and Radom owned and controlled Midwest and Superior Imaging.

283.   David Winter ("Winter") testified that he performs billing services for Midwest and reports to Derek Bittner.

284.   Derek Bittner and Radom simply continued the fraudulent scheme formed under the Elite entities through Midwest.

285.   Staff at the Elite entities immediately continued working for Derek Bittner and Radom under Midwest.

286.   For example, Allstate received bills and medical records signed by Richard Stanley, D.C. ("Stanley") from Elite Chiropractic on June 30, 2014.  *See* Exhibit 33.

287.   Just two (2) days later on July 2, 2014, Midwest submitted bills and medical records signed by Stanley for the same patient from the same office location. *Compare* Exhibit 33 *with* Exhibit 34.

288.   Indeed, Stanley told Allstate that Elite Chiropractic changed its name to Midwest on July 1, 2014.

289.   Stanley also told Allstate that it was his impression that Bittner owned Midwest.

290.   Again, it is improper for a chiropractor to own and control a medical clinic (like Midwest).

291.  Nicole Bittner—Derek Bittner's sister—became the Director of Chiropractic Services at Midwest, and was responsible for ensuring that "best practices, policies and procedures are established and followed by multiple offices." *See* Exhibit 35.

292.   Derek Bittner and Radom also continued the internal referral scheme developed under the Elite scheme by and through Midwest.

293.   For example, Patient D.S. (Claim No. 0342971702) testified that Midwest referrals were "in-house":

> Q.   So you went to Midwest Medical Clinic?
>
> A.   Yes.
>
> Q.   And they referred you to someone?
>
> A.   They actually had the doctors – a doctor there and physical therapy.  Everything was there.  So the refer [sic] was more in-house, I believe.

294.   Midwest also submitted bills to Allstate purportedly signed by a physician after his death.

295.   Marc Orlewicz, D.O. ("Orlewicz"), who purportedly treated patients at Midwest, died on December 22, 2016. *See* Exhibit 36.

296.   Midwest, however, submitted bills to Allstate allegedly signed by Orlewicz as late as March 2017—three (3) months after his death. *See* Exhibit 37.

297.   Derek Bittner and Radom also incorporated an MRI facility into their fraudulent network: Superior Imaging.

298.   J. Rosett approached Radom about getting involved in Superior Imaging, but Radom told him that it was "already spoken for" and that Derek Bittner was involved in Superior Imaging.

299.   Radom needed Derek Bittner involved with Superior in order to get more favorable reads of the MRI scans and to "re-read" the scans.

300.   Superior Imaging's Certificate of Need ("CON") lists Midwest as the owner.

301.   In fact, Superior Imaging's justification for submitting a CON Expedited Processing Request referenced the need to provide MRI scans to Midwest patients:

**SECTION 3 - Justification for Expedited Processing Request:** *(Attach additional sheets as necessary)*

Superior Diagnostics, Inc. is wholly-owned by Midwest Medical Associates (See CON-100; pg 4). As such, it is imperative to open the facility quickly in order to increase access to needed MRI services on behalf of the group's patients.

*Fig. 4 (section of Superior Imaging's Expedited Process Request)*

302.   Superior Imaging billed Allstate for MRI scans using Midwest's tax identification number, confirming that the two (2) entities are used interchangeably by Derek Bittner and Radom.  *See* Exhibit 38.

303.   Morse remained involved with Superior Imaging by and through his girlfriend, Amelia Anderson ("Anderson").

304.   Anderson was Superior Imaging's Marketing Director.  *See* Exhibit 39.

305.   Anderson attended the 2016 Fall Convention of the Michigan Association of Chiropractors on behalf of Superior Imaging.  *See* Exhibit 40.

306.   Derek Bittner and Radom fully incorporated Superior Imaging into their fraudulent scheme to maximize the number of bills that the defendants submitted to Allstate seeking reimbursement under the Michigan No-Fault Act.

## D.   FRAUDULENT INCORPORATION

307.   As discussed above, Derek Bittner and Radom fully incorporated Elite Health, Elite Rehab, Midwest, and Superior Imaging as non-profit corporations in order to evade legal prohibitions against the practice of medicine by non-physicians.

308.   The State of Michigan requires that each shareholder of a professional service corporation rendering services under the public health code "must be

licensed or legally authorized in this state to provide the same professional service." Mich. Comp. Laws § 450.1284(1).

309.   As a chiropractor, Derek Bittner cannot own a professional service corporation that provides non-chiropractic health services.

310.   As a layperson, Radom cannot own a professional service corporation that provides any health services.

311.   The Michigan Attorney General acknowledged that the restriction on professional corporation ownership is driven by policy concerns that include, notably, commercialization and layperson control of medical practices.  *See* Exhibit 41.

312.   The Articles of Incorporation for all four (4) defendant non-profits contain identical language expressing a purported charitable purpose:

> To provide health care services at the corporation's office locations through employed and/or contracted health care service providers to the community it serves, and to the extent that financial circumstances permit, provide charity care to persons in need.

313.   These professions of charity are disingenuous, given the qualification as to providing care only "to the extent that financial circumstances permit."

314.   None of the clinics are registered as a 501(c)(3) organization with the Internal Revenue Service.

315.   Nor have any of the four (4) defendant non-profits registered with the Michigan Attorney General pursuant to the Charitable Organizations and Solicitations Act, Mich. Comp. Laws § 400.271, *et seq.*

316.   By not registering with the federal government or the State of Michigan, these four (4) defendant non-profits forego the substantial tax advantages enjoyed by legitimate charities.

317.   Derek Bittner and Radom therefore incorporated these four (4) entities as non-profit corporations so as to circumvent Michigan law regarding the ownership of medical clinics by unlicensed individuals.

318.   Derek Bittner and Radom use D & M Management's so-called "management fees" to pull money from these non-profit corporations.

319.   Derek Bittner and Radom use these purported "management fees" as the mechanism to obtain the proceeds of the fraudulent treatment rendered by the defendant clinics.

320.   Soltis (the attorney who set up the defendant non-profits) testified that it is inappropriate for a person who owns a management company to direct medical decisions or referrals, because "the management company can't get involved in those types of independent medical judgments, so, yes, that would be inappropriate."

321.   Nonetheless, Derek Bittner and Radom, the co-owners of D & M Management, directly affected treatment.

322.   For example, Radom e-mailed an Elite Health medical assistant instructing her to make physical therapy referrals:

| | |
|---|---|
| **To:** | Akilia Jackson[AJackson@elitehealthcenters.com] |
| **Cc:** | JAY ROSETT[jayrosett@gmail.com] |
| **From:** | Mark Radom |
| **Sent:** | Wed 8/22/2012 12:00:41 PM |
| **Subject:** | Re: Auto Dr Referrals |

Hi Akilia,

Please make sure you are ready for Dr. Upfall, as far as new PT Scripts. Remind him to let the patient know how important going to PT is and why they are going to Michigan Center for PT. (because they specialize in their type of injury). Put notes in the file and pick ahead of time which patient should go.

Email me with any questions that u have.

Thank u.

Mark

*Fig. 5 (e-mail sent by Radom to Elite Health medical assistant)*

323.   Moreover, Derek Bittner actively advertises the fact that he owns multiple medical clinics for the purpose of maximizing his profits.

324.   Derek Bittner promoted his expertise in maximizing profits through Achiever A7, a program for which he is the Founder and CEO.  *See* Exhibit 42.

325.   The Achiever A7 webpage advertised: "Learn How Chiropractors Are Creating Multiple Streams of Income Without Sacrificing Their **TIME**."   Id. (emphasis original).

326.   Derek Bittner states: "You see, I went from pulling my hair out with one Chiropractic office to Multiple, **Multi-Disciplinary clinics** on cruise control.  I currently have multiple offices including: **Chiropractors, Neurosurgeons, Orthopedic, Neurologists, EMG's, MRI's** and much more."   Id. (emphasis original).

327.   Prior to incorporating the Elite entities, Derek Bittner owned and controlled one clinic: defendant Bittner Chiropractic.

328.   Entities owned and controlled by Derek Bittner and Radom provided all of the services mentioned on the Achiever A7 webpage, even though Derek Bittner is only a chiropractor and not allowed to own orthopedic or neurologic clinics under Michigan law.

329.   Elite Health and Midwest billed Allstate for services purportedly rendered by multiple orthopedists, including Noel Upfall, D.O. ("Upfall"), Reese James, D.O. ("James"), and Orlewicz.

330.   Neurologists James Honet, M.D. ("Honet") and Gireesh Velugubanti, M.D. ("Velugubanti") treated patients at issue in this Complaint at Elite Health and Midwest, respectively.

331.   Elite Health and Midwest performed electromyographies ("EMGs") on patients at issue in this Complaint.

332.   Superior Imaging performed MRI scans on patients at issue in this Complaint.

333.   Therefore, the defendant clinics performed precisely the services that Derek Bittner promotes through Achiever A7 as a way to "make more money, have less stress, but more importantly MORE FREEDOM!"  Id.

334.   Derek Bittner's own statements confirm that the four (4) defendant non-profits were created not for a charitable purpose but rather to maximize his and Radom's profits.

335.   Derek Bittner appeared on the June 12, 2017 episode of the podcast "The Chiropractic Philanthropist" to promote Achiever A7.   *Available at* https://www.youtube.com/watch?v=Q4cBZ-49XGE (last accessed Oct. 30, 2018).

336.   Derek Bittner's statements over the course of the episode confirm that he coordinated with Radom to establish multiple clinics as a means to maximize profits:

> At one time I had six chiropractic offices.  I have two physical therapy offices, medical clinics with a neurologist, surgeons, [and] anesthesiologists.  We do EEGs, EMGs, [and] MRIs.
>
> It's about maximizing your patients.  It's about, you know, if I have a patient and they're buying five things, why don't I sell them all five things?  And that's kind of what I did.
>
> You've got 200 people coming through your door that want to spend money.  Find out where they're spending money and open that because they already trust and love you, so why not make money off them and also give them a great product?
>
> [L]et's say you did have five other services.  Maybe four of your other patients come in from those other services, and then they get onto chiropractic.  And so now, you had one coming in for, you know, massage, and now that person becomes—you know, you have one coming in for a neurologist and now they become a chiropractic patient.

> And so now, you didn't even have to go get 'em.  They
> were already in your, in your service.

337.   Derek Bittner's statements confirm that he, in collaboration with Radom, established the defendant entities as part of a scheme to maximize the amount of treatment for which they could bill Allstate.

338.   Therefore, Derek Bittner and Radom incorporated four (4) non-profit corporations in violation of Michigan law, and then used D & M Management to siphon the money from these four (4) non-profits through so-called "management fees."

## VI.    BILLING FOR SERVICES NOT RENDERED

339.   The defendants frequently billed Allstate for services that were not actually rendered to patients at issue in this Complaint.

340.   The defendants' pervasive pattern of interstate faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

341.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never actually occurred are fraudulent.

342.   Therefore, Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### A.   CHIROPRACTIC TREATMENT NOT RENDERED

343.   Bittner Chiropractic, Elite Chiropractic, and Midwest faxed and mailed bills to Allstate seeking payment for chiropractic treatment that was never rendered to patients at issue in this Complaint.

344.   Elite Chiropractic submitted bills and medical records signed by Derek Bittner for patients that he never treated.

345.   Bittner Chiropractic, Elite Chiropractic, and Midwest also billed for multiple treatment modalities that are not documented as performed.

346.   Bittner Chiropractic, Elite Chiropractic, and Midwest billed Allstate using Current Procedural Terminology ("CPT") Codes, which are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

347.   Bittner Chiropractic, Elite Chiropractic, and Midwest submitted bills to Allstate through interstate wires and the U.S. Mail using CPT Codes 97010 ("*application of a modality to 1 or more areas; hot or cold packs*"), 97012

(*"application of a modality to 1 or more areas; traction, mechanical"*), and 97110 (*"therapeutic procedure, 1 or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion and flexibility"*).

348. To bill for services under CPT Code 97010, the medical record must indicate whether the provider rendered hot or cold treatment, the mechanism for rendering the treatment, the area(s) treated, the length of treatment, and the patient's response.

349. To bill for services under CPT Code 97012, the medical record must indicate the part of the body being treated, the mechanism of traction, the force of traction applied (pounds), the angle of pull, the amount of time the traction is applied, and the patient's response to the treatment.

350. To bill for services under CPT Code 97110, the medical record must indicate the exercise(s) performed, the time spent performing each exercise, the equipment necessary to provide the service, as well as the equipment settings and the patient's response to performing the exercise(s).

351. Bittner Chiropractic, Elite Chiropractic, and Midwest submitted medical records that failed to validate billing for the services covered by billing CPT Codes 97010, 97012, and 97110.

352.   Rather, the medical records submitted by Bittner Chiropractic, Elite Chiropractic, and Midwest are nothing more than limited template-style notes that simply identify the treatment modality allegedly performed.

353.   In failing to adequately document the services and procedures rendered, Bittner Chiropractic, Elite Chiropractic, and Midwest failed to complete a portion of the procedures billed, that is, the post-service component of the treatment reported.

354.   In other words, the medical records fail to justify each instance in which Bittner Chiropractic, Elite Chiropractic, and Midwest billed CPT Codes 97010, 97012, and 97110.

355.   Every instance of Bittner Chiropractic's, Elite Chiropractic's, and Midwest's billing of these codes is an instance of billing for a service that was never rendered.

356.   Allstate is not required to compensate Bittner Chiropractic, Elite Chiropractic, or Midwest for services that were never rendered and is entitled to the return of money paid in reliance of their fraud.  *See* Exhibits 1, 3, and 5.

## B.   PHYSICAL THERAPY NOT RENDERED

357.   Elite Health and Elite Rehab submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for physical therapy that was never rendered to patients at issue in this Complaint.

358. Elite Health and Elite Rehab allegedly rendered physical therapy on the same date that patients at issue in this Complaint received other services from Elite Chiropractic or from a pain management physician at Elite Health.

359. Transportation logs on these dates reveal that the patient did not remain at the defendant clinics long enough to receive both the chiropractic/pain management treatment and the physical therapy treatment allegedly rendered.

360. Elite Health and Elite Rehab also billed for various treatment modalities that are not supported by the medical records.

361. Elite Health and Elite Rehab billed Allstate using CPT Codes 97010, 97014 (*"application of a modality to 1 or more areas; electrical stimulation (unattended)"*), 97035 (*"application of a modality to 1 or more areas; ultrasound, each 15 minutes"*), and 97110.

362. To bill for services under CPT Code 97014, the medical record must indicate the polarity, waveform, intensity, mechanism of treatment, duration of pulses, phases of bursts, frequency, and the exact sites treated, as well as the patient's response to the treatment.

363. To bill for services under CPT Code 97035, the medical record must indicate the amount of time the service is rendered, as well as the rationale for the use of ultrasound, the area(s) tested, the frequency and intensity, and the patient's response to the treatment.

364. Elite Health and Elite Rehab submitted medical records that failed to validate billing for these services.

365. Rather, the medical records submitted by Elite Health and Elite Rehab are nothing more than limited template-style notes that simply identify the CPT Codes charged and fail to provide the required detail to support the billed treatment.

366. In failing to adequately document the services and procedures rendered, Elite Health and Elite Rehab failed to complete a portion of the procedures billed, that is, the post-service component of the treatment reported.

367. In other words, the medical records fail to justify each instance in which Elite Health and Elite Rehab billed CPT Codes 97010, 97014, 97035, and 97110. *See* Exhibits 2 and 4.

368. Every instance of Elite Health's and Elite Rehab's billing of these codes is an instance of billing for a service that was never rendered.

369. Allstate is not required to compensate Elite Health or Elite Rehab for services that were never rendered and is entitled to the return of money paid in reliance on their fraud.

## C. MASSAGE THERAPY NOT RENDERED

370. Elite Chiropractic and Midwest submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for massage therapy treatment that was never rendered to patients at issue in this Complaint.

371. Elite Chiropractic and Midwest billed Allstate using CPT Code 97124 (*"therapeutic procedure, 1 or more areas, each 15 minutes; massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)"*).

372. The following are examples of patients for whom Elite Chiropractic and Midwest billed Allstate for massage therapy that was not rendered:

- Patient L.M. (Claim No. 0285026456) allegedly presented to Elite Chiropractic on September 20 and 23, 2013. Elite Chiropractic billed Allstate for massage therapy allegedly rendered on those dates. The medical records, however, lack any indication that L.M. received massage therapy.

- Patient B.F. (Claim No. 0342496543) allegedly received massage therapy at Midwest on November 7, 2014. Despite billing Allstate for this treatment, the medical records submitted to Allstate fail to include any mention of anyone at Midwest providing B.F. with massage therapy.

- Patient D.S. (Claim No. 0342971702) allegedly presented to Midwest on November 12, 2014. Midwest submitted a bill to Allstate purporting to provide massage therapy to D.S. The medical records however, do not indicate that D.S. ever received massage therapy.

373. Allstate is not required to compensate Elite Chiropractic or Midwest for massage therapy that were never rendered and is entitled to the return of money paid in reliance on their fraud.

### D. EXEMPLAR CLAIMS

374. The defendants' billing for services not rendered is exemplified by the following representative patients.

## 1.   Patient T.S. (Claim No. 0225944487)

375.   Patient T.S. was allegedly involved in a motor vehicle accident on November 14, 2011.

376.   T.S. presented to Elite Chiropractic on December 3, 2011.

377.   Elite Chiropractic submitted bills and accompanying medical records signed by Derek Bittner for dates of service from December 3, 2011 through May 9, 2012.

378.   T.S. testified that she initially received treatment from "Dr. Cody."

379.   "Dr. Cody" is Cody Senkyr, D.C. ("Senkyr").

380.   T.S. denied ever receiving treatment from Derek Bittner:

Q.   And when he was working on you did you, did you ever see Dr. Bitner [sic]?

A.   No.

381.   Derek Bittner testified that he signed the bills and medical records for T.S. because Senkyr was an intern working under Derek Bittner's license.

382.   Derek Bittner testified further that Senkyr treated T.S. until March 30, 2012.

383.   However, T.S. testified that Senkyr only provided treatment for "about maybe a month, a month and-a-half, and then he left, they sent him to another office."

384.   This timeline corresponds with T.S.'s testimony for when she received her first injection:

> Q.   Okay.  And did you have the shots during the same time that you were still seeing Dr. Cody, so they would have been like within that first month, month and-a-half or two?
>
> A.   Yes.  I think I got maybe one shot started but by that time he was leaving.

385.   T.S. received her first injection at Elite Health on January 19, 2012, which is a month and a half after T.S. initiated treatment at Elite Chiropractic.

386.   Therefore, Senkyr stopped treating T.S. in mid-January 2012.

387.   Elite Chiropractic continued submitting bills and medical records signed by Derek Bittner—purporting that Senkyr rendered treatment—as late as May 9, 2012.

388.   Elite Chiropractic never rendered this treatment because T.S. no longer treated with Senkyr and Derek Bittner never rendered treatment to T.S.

389.   T.S. also denied ever participating in group therapy.

390.   Elite Chiropractic billed Allstate using CPT Code 97150 (*"therapeutic procedure(s), group (2 or more individuals)"*) on twenty-one (21) dates of service for a total of $1,365.00.

391.   T.S. also denied that Elite Chiropractic ever applied hot or cold packs:

Q.    And you've said that the bed was heated but you
       don't, you don't recall ever getting hot or cold packs
       on you?

A.    It wasn't, no, I didn't get any hot or cold packs, no.

392.   Elite Chiropractic billed Allstate for the application of hot or cold packs

under CPT Code 97010 on 105 dates of service for a total of $5,250.00.

393.   Elite Chiropractic and Derek Bittner submitted claims for payment and

accompanying medical records relative to T.S. to Allstate through interstate wires

and the U.S. Mail for treatment that was not provided on which Allstate relied in

adjusting the claims.

394.   Allstate is not required to pay Elite Chiropractic or Derek Bittner for

treatment that was not provided to T.S.

**2.    Patient W.B. (Claim No. 0285026456)**

395.   Patient W.B. was allegedly involved in a motor vehicle accident on

May 5, 2013.

396.   W.B. presented to Elite Chiropractic on September 20, 2013 for an

initial evaluation with Michael Draplin, D.C. ("Draplin").

397.   Elite Chiropractic billed Allstate for chiropractic treatment purportedly

rendered by Nicole Bittner on February 17, 2014 and March 10, 2014.

398.   Draplin testified that he was the only chiropractor working at the

Detroit office of Elite Chiropractic.

399.   Draplin testified further that he and Nicole Bittner did not work together.

400.   Nicole Bittner did not provide W.B. with chiropractic treatment because she did not work at the Detroit office of Elite Chiropractic.

401.   Elite Chiropractic and Nicole Bittner submitted claims for payment and accompanying medical records relative to W.B. to Allstate through interstate wires and the U.S. Mail for treatment that was not rendered, upon which Allstate relied in adjusting the claims.

402.   Allstate is not required to pay Elite Chiropractic or Nicole Bittner for treatment that was never provided to W.B. and is entitled to the return of money paid to Elite Chiropractic in reliance on its fraudulent bills.

### 3.   Patient D.M. (Claim No. 0240062991)

403.   Patient D.M. was allegedly involved in a motor vehicle accident on March 31, 2012.

404.   D.M. presented to Elite Health on May 23, 2012 for an initial evaluation with Upfall.

405.   Upfall provided D.M. with a prescription for physical therapy and referred her to Elite Rehab.

406.   D.M. initiated physical therapy at Elite Rehab on May 31, 2012.

407.   D.M. testified that she only went to Elite Rehab for three (3) weeks and stopped going there because they "were not very friendly."

408.   D.M. was also receiving chiropractic treatment at Chesterfield Family Chiropractic Center, P.C. ("Chesterfield") from Todd Kleinstein, D.C. ("Kleinstein").

409.   D.M. testified that she never received chiropractic treatment at Chesterfield and physical therapy at Elite Rehab on the same day: "Not the same days but in the same [time] frame, yes."

410.   Allstate received bills from both Chesterfield and Elite Rehab for treatment allegedly rendered on June 4, 2012.

411.   Elite Rehab billed Allstate $280.00 for services that were not rendered on June 4, 2012 because D.M. never presented to Chesterfield and Elite Rehab on the same day.

412.   Elite Rehab also submitted bills to Allstate containing CPT Code 97110 related to D.M.

413.   CPT Code 97110 requires direct, one-on-one supervision of the therapeutic exercises.

414.   D.M. testified that the physical therapist at Elite Rehab "wouldn't stay the whole time" while she performed the exercises.

415.   Elite Rehab therefore billed Allstate $770.00 for therapeutic exercises that were not rendered.

416.   Elite Rehab submitted claims for payment and accompanying medical records relative to D.M. to Allstate through interstate wires and the U.S. Mail for treatment that was not rendered.

417.   Allstate relied on Elite Rehab's submissions in adjusting the claims.

418.   Allstate is not required to pay Elite Rehab for treatment that was never provided to D.M. and is entitled to the return of money paid to Elite Rehab in reliance on its fraudulent bills.

### 4.   Patient D.G. (Claim No. 0259066496)

419.   Patient D.G. was allegedly involved in a motor vehicle accident on September 10, 2012.

420.   D.G. initiated chiropractic treatment at Elite Chiropractic on September 17, 2012.

421.   D.G. initiated physical therapy at Elite Rehab on November 5, 2012.

422.   D.G. allegedly received treatment at both Elite Chiropractic and Elite Rehab on November 26, 2012.

423.   The November 26, 2012 transportation log from RGR Ventures, LLC d/b/a R & R Transportation indicates that D.G. arrived for treatment at 9:15 a.m. and departed at 10:00 a.m.

424. Elite Chiropractic and Elite Rehab are located at the same address.

425. D.G. therefore was present at Elite Chiropractic and Elite Rehab for a combined total of forty-five (45) minutes.

426. Elite Chiropractic's bill for November 26, 2012 includes one (1) unit of CPT Code 97110 and one (1) unit of CPT Code 97112.

427. Elite Rehab's bill for November 26, 2012 includes two (2) units of CPT Code 97110 and one (1) unit of CPT Code 97530.

428. CPT Codes 97110, 97112, and 97530 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

429. Each fifteen (15) minute unit of these CPT Codes requires a minimum of eight (8) defined minutes of treatment to be performed before a single unit can be properly billed.

430. When multiple units of a timed CPT Code are billed, the second (and subsequent) unit requires the full fifteen (15) minutes for the first unit, followed by at least eight (8) minutes of the second unit.

431. To properly bill for two (2) units of a timed CPT Code, at least twenty-three (23) minutes of treatment must be performed; for three (3) units, at least thirty-eight (38) minutes of treatment must be performed; and so on.

432. Therefore, Elite Chiropractic billed Allstate for providing at least sixteen (16) minutes of treatment on November 26, 2012.

433. Elite Rehab billed Allstate for providing at least thirty-one (31) minutes of treatment on November 26, 2012.

434. The timed billing codes alone—totaling forty-seven (47) minutes—exceed the amount of time that D.G. was present at the clinic (and does not include driving time, wait time, or any other treatment D.G. underwent on November 26, 2012).

435. D.G. therefore did not receive the treatment billed by Elite Chiropractic and Elite Rehab on November 26, 2012.

436. Beginning on January 17, 2014, D.G. stopped receiving physical therapy at Elite Rehab and began physical therapy at Rehabilitation of Detroit (an assumed name for Elite Health).

437. D.G. allegedly received treatment at both Elite Chiropractic and Elite Health on June 10, 2014.

438. The June 10, 2014 transportation log from Hour Transportation Management Inc. d/b/a Hour Transportation indicates that D.G. was picked up at his home at 9:30 a.m. and departed from treatment at 10:21 a.m.

439. Elite Chiropractic and Elite Health are located at the same address.

440. D.G. therefore was present at Elite Chiropractic and Elite Health for less than 51 minutes because this 51 minutes included transporting D.G. from his home to Elite Chiropractic and Elite Health.

441.   Elite Chiropractic's bill for June 10, 2014 includes one (1) unit of CPT Code 97110, one (1) unit of CPT Code 97112, and one (1) unit of CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*").

442.   Elite Health's bill for June 10, 2014 includes two (2) units of CPT Code 97110 and one (1) unit of CPT Code 97140.

443.   CPT Codes 97110, 97112, and 97140 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

444.   As discussed *supra*, a timed billing code requires at least eight (8) minutes of treatment per unit.

445.   Therefore, Elite Chiropractic billed Allstate for providing at least twenty-four (24) minutes of treatment on June 10, 2014.

446.   Elite Health billed Allstate for providing at least thirty-one (31) minutes of treatment on June 10, 2014.

447.   The timed billing codes alone—totaling 55 minutes—exceed the amount of time that D.G. was present at the clinic (and does not include wait time or any other treatment D.G. underwent on June 10, 2014).

448.   D.G. therefore did not receive the treatment billed by Elite Chiropractic and Elite Health on June 10, 2014.

449. Elite Chiropractic, Elite Rehab, and Elite Health submitted claims for payment and accompanying medical records relative to D.G. to Allstate through interstate wires and the U.S. Mail for treatment that was not rendered, upon which Allstate relied in adjusting the claims.

450. Allstate is not required to pay Elite Chiropractic, Elite Rehab, or Elite Health for treatment that was never rendered to D.G. and is entitled to the return of money paid to Elite Chiropractic and Elite Rehab in reliance on their fraudulent bills.

### 5. Patient Y.W. (Claim No. 0228856902)

451. Patient Y.W. was allegedly involved in a motor vehicle accident on December 10, 2011.

452. Y.W. initiated chiropractic treatment at Elite Chiropractic on December 13, 2011 with Derek Bittner.

453. Y.W. initiated physical therapy at Elite Rehab on February 1, 2012.

454. Y.W. allegedly received treatment at Elite Chiropractic, Elite Rehab, and Elite Health on February 22, 2012.

455. The February 22, 2012 transportation log from Barron Transportation LLC ("Barron Transportation") indicates that Y.W. arrived at the Elite entities for treatment at 2:05 p.m. and departed at 3:15 p.m.

456. The Elite entities are located at the same address.

457. Y.W. therefore was present at Elite Chiropractic, Elite Rehab, and Elite Health for a combined total of 70 minutes.

458. Elite Chiropractic's bill for February 22, 2012 includes CPT Code 99213 (Level 3 established patient evaluation) and one (1) unit of CPT Code 97150.

459. Elite Rehab's bill for February 22, 2012 includes one (1) unit of CPT Code 97110 and one (1) unit of CPT Code 97124.

460. Elite Health billed Allstate with CPT Code 99204 (Level 4 initial patient evaluation) on February 22, 2012.

461. CPT Codes 97110, 97124, and 97150 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

462. As discussed *supra*, a timed billing code requires at least eight (8) minutes of treatment per unit.

463. As discussed in more detail *infra*, CPT Code 99213 requires fifteen (15) minutes of face-to-face time between the practitioner and the patient.

464. CPT Code 99204 requires forty-five (45) minutes of face-to-face time between the practitioner and the patient.

465. Therefore, Elite Chiropractic billed Allstate for providing at least twenty-three (23) minutes of treatment on February 22, 2012.

466. Elite Rehab billed Allstate for providing at least sixteen (16) minutes of treatment on February 22, 2012.

467.   Elite Health billed Allstate for providing at least forty-five (45) minutes of treatment on February 22, 2012.

468.   The timed billing codes alone from the three (3) Elite entities—totaling 84 minutes—exceed the amount of time that Y.W. was present at the clinic (and does not include wait time or any other treatment Y.W. underwent on February 22, 2012).

469.   Y.W. therefore did not receive the treatment billed by Elite Chiropractic, Elite Rehab, and Elite Health on February 22, 2012.

470.   Y.W. purportedly received treatment at both Elite Chiropractic and Elite Rehab on October 15, 2012.

471.   The October 15, 2012 transportation log from FS Complete Transportation Services LLC indicates that Y.W. arrived for treatment at 1:00 p.m. and departed at 1:44 p.m.

472.   Elite Chiropractic and Elite Rehab are located at the same address.

473.   Y.W. therefore was present at Elite Chiropractic and Elite Rehab for a combined total of forty-four (44) minutes.

474.   Elite Chiropractic's bill for October 15, 2012 includes one (1) unit of CPT Code 97110 and one (1) unit of CPT Code 97112.

475.   Elite Rehab's bill for October 15, 2012 includes three (3) units of CPT Code 97110.

476.   CPT Codes 97110 and 97112 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

477.   As discussed *supra*, a timed billing code requires at least eight (8) minutes of treatment per unit.

478.   Therefore, Elite Chiropractic billed Allstate for providing at least sixteen (16) minutes of treatment on October 15, 2012.

479.   Elite Rehab billed Allstate for providing at least thirty-eight (38) minutes of treatment on October 15, 2012.

480.   The timed billing codes alone—totaling 54 minutes—exceed the amount of time that Y.W. was present at the clinic (and does not include wait time or any other treatment Y.W. underwent on October 15, 2012).

481.   Y.W. therefore did not receive the treatment billed by Elite Chiropractic and Elite Rehab on October 15, 2012.

482.   Elite Chiropractic, Elite Health, and Elite Rehab submitted claims for payment and accompanying medical records relative to Y.W. to Allstate through the U.S. Mail for treatment that was not provided, upon which Allstate relied in adjusting the claims.

483.   Allstate is not required to pay Elite Chiropractic, Elite Health, or Elite Rehab for treatment that was never rendered to Y.W. and is entitled to the return of

money paid to Elite Chiropractic, Elite Health, and Elite Rehab in reliance on their fraudulent bills.

### 6.    Patient L.W. (Claim No. 0217689009)

484.    Patient L.W. was allegedly involved in a motor vehicle accident on September 7, 2011.

485.    L.W. initiated chiropractic care at Elite Chiropractic on September 12, 2011.

486.    L.W. initiated physical therapy at Elite Rehab on January 2, 2012.

487.    L.W. allegedly received treatment at both Elite Chiropractic and Elite Rehab on January 20, 2012.

488.    The January 20, 2012 transportation log from Barron Transportation indicates that L.W. arrived for treatment at 10:10 a.m. and departed at 10:40 a.m.

489.    Elite Chiropractic and Elite Rehab are located at the same address.

490.    L.W. therefore was present at Elite Chiropractic and Elite Rehab for a combined total of thirty (30) minutes.

491.    Elite Chiropractic's bill for January 20, 2012 includes one (1) unit of CPT Code 97150.

492.    Elite Rehab's bill for January 20, 2012 includes two (2) units of CPT Code 97110 and two (2) units of CPT Code 97124.

493.   CPT Codes 97110, 97124, and 97150 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

494.   As discussed *supra*, a timed billing code requires at least eight (8) minutes of treatment per unit.

495.   Therefore, Elite Chiropractic billed Allstate for providing at least eight (8) minutes of treatment on January 20, 2012.

496.   Elite Rehab billed Allstate for providing at least forty-six (46) minutes of treatment on January 20, 2012.

497.   The timed billing codes alone—totaling 54 minutes—far exceed the amount of time that L.W. was present at the clinic (and does not take into account wait time or any other treatment L.W. underwent on January 20, 2012).

498.   L.W. therefore did not receive the treatment billed by Elite Chiropractic and Elite Rehab on January 20, 2012.

499.   Elite Chiropractic and Elite Rehab submitted claims for payment and accompanying medical records relative to L.W. to Allstate through interstate wires and the U.S. Mail for treatment that was not rendered, upon which Allstate relied in adjusting the claims.

500.   Allstate is not required to pay Elite Chiropractic or Elite Rehab for treatment was never provided to L.W. and is entitled to the return of money paid to Elite Chiropractic in reliance on its fraudulent bills.

## VII.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

### A.   UNLICENSED MASSAGE THERAPY

501.   Elite Chiropractic and Midwest rendered massage therapy treatment, if they provided such treatment at all, by unlicensed individuals.

### 1.   Massage Therapy License Requirements

502.   Prior to November 29, 2014, massage therapists had to adhere to local licensing requirements.

503.   Elite Chiropractic and Midwest purportedly rendered massage therapy in Detroit.

504.   The City of Detroit prohibited any person to engage in the practice of massage without a license.  Detroit Mun. Code §§ 32-2-1(b), 32-1-1.

505.   Since November 29, 2014, Michigan requires massage therapists to have a license issued by the State.  Mich. Comp. Laws §§ 333.17957, 17959.

### 2.   Elite Chiropractic and Midwest Rendered Unlicensed Massage Therapy Before November 29, 2014

506.   Elite Chiropractic submitted medical records signed by Jazmine Ateman ("Ateman") and Gabrielle Dismuke ("Dismuke") for alleged massage therapy treatment rendered prior to November 29, 2014.

507.   Midwest also submitted medical records signed by Ateman for massage therapy allegedly rendered prior to November 29, 2014.

508.   Dismuke worked in the Detroit office of Elite Chiropractic.

509.   Ateman worked in the Detroit offices of Elite Chiropractic and Midwest.

510.   Neither Ateman nor Dismuke ever applied for or obtained a license from the City of Detroit to perform massage therapy.

511.   Dismuke therefore provided unlicensed massage therapy treatment at Elite Chiropractic.

512.   Ateman therefore provided unlicensed massage therapy treatment at Elite Chiropractic and Midwest.

513.   Treatment rendered without a license is not compensable under the Michigan No-Fault Act.  *See* Mich. Comp. Laws § 500.3157.

514.   Allstate is not required to compensate Elite Chiropractic or Midwest for treatment rendered without a license and is entitled to reimbursement of monies paid.

### 3.   <u>Elite Chiropractic Rendered Unlicensed Massage Therapy After November 29, 2014</u>

515.   Ateman purportedly continued rendering massage therapy treatment at Midwest after November 29, 2014.

516.   Ateman never obtained a license from the State of Michigan to perform massage therapy.

517.   Ateman therefore rendered massage therapy without the required license.

518.   Midwest submitted bills signed by Draplin for the alleged massage therapy treatment.

519.   Midwest therefore attempted to conceal the fact that Ateman performed unlicensed massage therapy treatment.

520.   Draplin is not licensed to perform massage therapy.

521.   Treatment rendered without a license is not compensable under the Michigan No-Fault Act.  *See* Mich. Comp. Laws § 500.3157.

522.   Allstate therefore is not required to compensate Midwest for treatment rendered without a license and is entitled to reimbursement of monies paid.

### B.   UNLICENSED CHIROPRACTIC TREATMENT

523.   Elite Chiropractic rendered chiropractic treatment, if it provided such treatment at all, by an unlicensed individual.

524.   The State of Michigan prohibits an individual from "engag[ing] in the practice of chiropractic, including, but not limited to, performing a chiropractic adjustment, chiropractic manipulation, or other chiropractic services or chiropractic opinion, unless licensed, or otherwise authorized by a chiropractor."  Mich. Comp. Laws § 333.16411(1).

525.   An individual may engage in the practice of chiropractic under a limited license "as part of his or her chiropractic education."   Mich. Comp. Laws § 333.16412(1).

526.    An individual with a limited license may engage in the practice of chiropractic only under the supervision of a licensed chiropractor.  Mich. Comp. Laws § 333.16412(2).

527.    A limited license is only valid for six (6) months.  Mich. Comp. Laws § 333.16412(3).

528.    Senkyr treated patients at Elite Chiropractic in 2011 and 2012.

529.    However, Senkyr did not obtain his chiropractic license from the State of Michigan until October 5, 2015—at least three (3) years after treating patients at Elite Chiropractic.

530.    Therefore, Senkyr rendered unlicensed chiropractic treatment at Elite Chiropractic.

531.    Derek Bittner testified that Senkyr was an "intern" who worked under his license while Senkyr waited to take the boards:

> Q.    What does it mean that he's an intern?
>
> A.    He was working under my license while he was waiting to take his boards.

532.    The only way that Senkyr may legally have practiced chiropractic under Derek Bittner's license was through a limited license.

533.    However, Senkyr never applied for or obtained a limited license to practice chiropractic.

534.    Moreover, Senkyr graduated from Northwestern Health Sciences University on April 6, 2011.

535.    Therefore, even if Senkyr had obtained a limited license—which he did not—any treatment provided after April 6, 2011 would not be "part of his chiropractic education." Mich. Comp. Laws § 333.16412(1).

536.    Furthermore, Elite Chiropractic held Senkyr out to patients at issue in this Complaint as a licensed chiropractor.

537.    As late as July 2012, the Elite Health website identified Senkyr as a chiropractor. *See* Exhibit 30.

538.    Indeed, Elite Chiropractic records identified Senkyr as "Cody Senkyr DC," suggesting that he was a licensed chiropractor:



*Fig. 6 (Elite Chiropractic record referencing Senkyr as a licensed chiropractor) (highlighting added).*

539.    Senkyr, by and through Elite Chiropractic, held himself out to patients at issue in this Complaint as a licensed chiropractor.

540.   For example, Patient T.S. (Claim No. 022594487) initiated treatment at Elite Chiropractic with Senkyr on December 3, 2011.

541.   Senkyr was not a licensed chiropractor at that time.

542.   T.S. testified that Senkyr introduced himself as "Dr. Cody":

Q.   Okay.   And Dr. Cody, is he, was he a medical doctor, was he a chiropractor, what was he?

A.   Far as I know he was a chiropractor.

Q.   Okay.   And when Dr. Cody, when you first saw Dr. Cody at the first visit did he tell you that he was a chiropractor, did you have any kind of discussion about him or his background or anything?

A.   Not really because he came in after I did, I was waiting for him.

Q.   Okay.

A.   He introduced himself as Dr. Cody.

543.   Elite Chiropractic took active steps to conceal that Senkyr provided unlicensed chiropractic treatment.

544.   Elite Chiropractic submitted bills and medical records signed by Derek Bittner for the treatment that Senkyr rendered to T.S.

545.   Elite Chiropractic placed patients at issue in this Complaint at risk by rendering chiropractic treatment by an unlicensed individual.

546.   Indeed, T.S. testified to errors in treatment rendered by Senkyr.

547. T.S. testified that Senkyr left Elite Chiropractic, and she continued her treatment with Bernard Hughey, D.C. ("Hughey").

548. T.S. testified further that she later learned that Senkyr improperly performed elements of her treatment:

549. For example, when asked if she found the exercises to be beneficial, T.S. testified:

> Q. But did you find those exercises to be beneficial?
>
> A. Well, see, it's different. With Dr. Cody, no, because come to find out he had the whole band wrong, the adjustment thing was just totally wrong. So when I, I tried at that time, we found out later after he was gone that the band was set up backwards.

550. Allstate is not required to compensate Elite Chiropractic for treatment rendered without a license and is entitled to reimbursement of monies paid.

## C. DEFENDANTS FAILED TO OBTAIN THE REQUIRED LICENSURE TO ISSUE DME IN THE STATE OF MICHIGAN

551. Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest unlawfully issued DME to patients without obtaining the required licensure from the State of Michigan.

552. The Michigan Board of Pharmacy governs the "practice of pharmacy" in the State of Michigan. Mich. Comp. Laws § 333.17722.

553. The Michigan Board of Pharmacy's duties include the "regulat[ion], control, and inspect[ion] [of] the character and standard of pharmacy practice and of

drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** and procure samples and limit or prevent the sale of drugs and devices that do not comply with this part."   Mich. Comp. Laws § 333.17722(a) (emphasis added).

554.   "Device" means "an instrument, apparatus, or contrivance, including its components, parts, and accessories, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or other animals, or to affect the structure or function of the body of human beings or other animals." Mich. Comp. Laws § 333.17703(2).

555.   One of the ways in which the Michigan Board of Pharmacy regulates, controls, and inspects the issuance of devices in the State of Michigan is to require an individual or entity issuing the device to obtain a license from the Board.  Mich. Comp. Laws § 333.17722(c).

556.   The issuance of a license for an activity within the scope of the Michigan Board of Pharmacy's governance determines whether the activity is lawful.  Mich.  Comp. Laws § 333.16106(2).

557. The Michigan Public Health Code defines a "license" as "an authorization issued under this article to practice **where practice would otherwise be unlawful**." Id. (emphasis added).

558.   Therefore, the State of Michigan requires a license issued by the Michigan Board of Pharmacy in order to issue medical equipment/devices to individuals.

559.   Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest submitted bills to Allstate through interstate wires and the U.S. Mail for the purported issuance of DME to patients at issue herein, even though Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest never possessed a license to issue DME in the State of Michigan.

560.   Draplin testified that he issued DME at Midwest without knowing whether his license enabled him to do so:

> Q.   And then in the note for that January 7th, 2015, he was given a – is that a TENS unit?
>
> A.   Yes.
>
> Q.   And you would have given him that?
>
> A.   Yes, I would have.
>
> Q.   Does your license allow you to prescribe a TENS unit to a patient, do you know?
>
> A.   I don't know.

561.   Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest each failed to obtain a license from the Board of Pharmacy and therefore unlawfully issued DME to patients at issue herein.

562.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

563.   Allstate is not required to pay Bittner Chiropractic, Elite Chiropractic, Elite Rehab, or Midwest for the unlawful issuance of DME and is entitled to restitution for monies paid.

## VIII.   ILLEGAL SOLICITATION

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

564.   Michigan law prohibits the identification and solicitation of potential patients of medical providers, the use of agents to solicit patients, and the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

565.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503.

566.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

567. As set forth above and below, the defendants participated in and knowingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

## B.    IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

568. Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

569. As discussed *supra*, the defendants operated an entity, AIB, which obtained illegal unapproved police reports and contacted motor vehicle accident victims shortly after their motor vehicle accident.

570. AIB referred the solicited motor vehicle accident victims to Morse's firm for legal representation.

571. Through a *quid pro quo* arrangement, attorneys at Morse's firm, who are laypersons and not medical professionals, referred Allstate insureds to the defendant clinics.

572. Several patients identified their personal injury attorney as the person who referred them to receive treatment at the defendant clinics.

573. Multiple patients at issue in this Complaint have reported that they received unsolicited phone calls within hours or days of their alleged motor vehicle accident.

574.   For example, the Federal Bureau of Investigations ("FBI") conducted an interview on September 26, 2014 with a former patient of Derek Bittner.

575.   The former patient told the FBI that she started receiving phone calls from Howard Jones ("Jones") about a day after her motor vehicle accident.

576.   Jones told the former patient that she could see Derek Bittner at no cost to her, and proceeded to write down Derek Bittner's information and call Derek Bittner's office to schedule an appointment for her.

577.   The former patient told the FBI that "[i]t sounded like Jones had dealt with the office before."

578.   Patients also reported that they received solicitation calls from individuals who falsely claimed to be associated with Allstate in order to deceive the patients into believing they were required to undergo treatment.

579.   Allstate is not required to compensate the defendants for medically unnecessary treatment stemming from illegal solicitation.

C.   **SPECIFIC EXAMPLES OF PATIENT SOLICITATION**

580.   Patients at issue in this Complaint have confirmed that they were solicited to treat by and with the defendants.

581.   The following representative patients exemplify the fact and extent of the defendants' illegal solicitation efforts.

### 1. Patient D.R. (Claim No. 0272895573)

582. Patient D.R. was allegedly involved in a motor vehicle accident on January 10, 2013.

583. D.R. presented to Bittner Chiropractic the next day for treatment with Derek Bittner.

584. D.R. told Allstate that he went to Bittner Chiropractic because he thought that Allstate wanted him to.

585. Further, D.R. told Allstate that someone called him, picked him up at his home, and transported him to Bittner Chiropractic for treatment.

586. Allstate does not make referrals for treatment.

587. Bittner Chiropractic and Derek Bittner submitted claims for payment and medical records relative to D.R. through the U.S. Mail upon which Allstate relied in adjusting the claims.

588. Allstate is not required to pay Bittner Chiropractic or Derek Bittner for unnecessary treatment that was the result of illegal solicitation and is entitled to the return of money paid to Bittner Chiropractic.

### 2. Patient G.T. (Claim No. 0280158122)

589. Patient G.T. was allegedly involved in a motor vehicle accident on March 20, 2013.

590.   G.T. presented to Elite Chiropractic two (2) days later on March 22, 2013.

591.   G.T. told Allstate that Elite Chiropractic called her after the motor vehicle accident:

> Q.   Okay.  And how—how did you end up—how was it that you came to Elite Chiropractic, um, you know, how did you end up going there of all the different clinics that you had the opportunity obviously to go to in the city?
>
> A.   I don't know, I, uh—I—I was very much surprised, they called me.
>
> Q.   Okay.
>
> A.   I didn't call them, they called me.
>
> Q.   Okay.  When you say they called you, did—do you know if it was Elite Chiropractic or was it the attorney, the—the law firm that called you?
>
> A.   I really don't know.  They co—uh, uh, the E—Elite, uh, uh, called me.
>
> Q.   Okay.
>
> A.   And that's why it was so puzzling to me because I was wondering where did they get my name and—and—and one thing after another.

592.   Elite Chiropractic submitted claims for payment and medical records relative to G.T. to Allstate through the U.S. Mail upon which Allstate relied in adjusting the claims.

593.   Allstate is not required to pay Elite Chiropractic for unnecessary treatment that derived from illegal solicitation and is entitled to the return of money paid to Elite Chiropractic.

### 3.   Patient D.P. (Claim No. 0377639967)

594.   Patient D.P. was allegedly involved in a motor vehicle accident on July 19, 2015.

595.   D.P. testified that he went to see defendant Nicole Bittner at the direction of his lawyers:

> Q.   Okay, why did you go to the chiropractor?
>
> A.   I was told that I needed to go.
>
> Q.   Who told you?
>
> A.   Probably my lawyers.

596.   Nicole Bittner referred D.P. to physicians at Midwest.

597.   Midwest referred D.P. to Superior Imaging for an unnecessary MRI scan of his brain.

598.   Midwest, Superior Imaging, and Nicole Bittner submitted claims for payment and medical records relative to D.P. to Allstate through the U.S. Mail upon which Allstate relied in adjusting the claims.

599. Allstate is not required to pay Midwest, Superior Imaging, or Nicole Bittner for unnecessary treatment that derived from illegal solicitation and is entitled to the return of money paid to Superior Imaging.

### 4. Patient T.S. (Claim No. 0225944487)

600. Patient T.S. was allegedly involved in a motor vehicle accident on November 14, 2011.

601. T.S. presented to Elite Chiropractic on December 3, 2011.

602. T.S. testified that she went to "the Elite Center" at the direction of her attorney.

603. T.S. testified further that her attorney provided her with transportation to Elite Chiropractic:

> A. Yeah, because you know what, they got me a driver.
>
> Q. Who did, the attorney?
>
> A. Yes, got me a driver and the – yeah.

604. Elite Chiropractic referred T.S. to Elite Health for unnecessary treatment and injections.

605. Elite Chiropractic and Elite Health submitted claims for payment and medical records relative to T.S. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

606.   Allstate is not required to pay Elite Chiropractic or Elite Health for unnecessary treatment that was the result of illegal solicitation and is entitled to the return of money paid to Elite Health.

### 5.   Patient T.P. (Claim No. 0327585485)

607.   Patient T.P. was allegedly involved in a motor vehicle accident on May 13, 2014.

608.   T.P. presented to Chesterfield just nine (9) days later on May 22, 2014 to initiate chiropractic treatment.

609.   T.P. testified that his attorney referred him to Kleinstein:

Q.   How did you go to Dr. Todd Kleinstein?

A.   When I came here, they recommended me to go see Dr. Kleinstein.

Q.   Your attorneys?

A.   My attorney, yes.

610.   T.P. testified that Kleinstein referred him to Midwest.

611.   T.P. presented to Midwest on August 27, 2014 for an evaluation.

612.   Midwest submitted claims for payment and medical records relative to T.P. to Allstate through the U.S. Mail upon which Allstate relied in adjusting the claims.

613.   Allstate is not required to pay Midwest for unnecessary treatment that was the result of illegal solicitation and is entitled to the return of money paid to Midwest.

### 6.   Patient D.M. (Claim No. 0240062991)

614.   Patient D.M. was allegedly involved in a motor vehicle accident on March 31, 2012.

615.   D.M. presented to Chesterfield just four (4) days later on April 4, 2012 to initiate chiropractic treatment.

616.   D.M. testified that her attorney sent her to Kleinstein:

Q.     Your law firm sent you to the chiropractor?

A.     Yes.

617.   Kleinstein referred D.M. to Elite Health.

618.   D.M. presented to Elite Health on May 23, 2012 for an initial patient evaluation with Upfall.

619.   Upfall provided D.M. with a prescription for physical therapy and referred D.M. to Elite Rehab.

620.   Elite Health and Elite Rehab submitted claims for payment and medical records relative to D.M. through the U.S. Mail upon which Allstate relied in adjusting the claims.

621.   Allstate is not required to pay Elite Health or Elite Rehab for unnecessary treatment that was the result of illegal solicitation and is entitled to the return of money paid to Elite Health and Elite Rehab.

### 7.   Patient L.P. (Claim No. 0361165632)

622.   Patient L.P. was allegedly involved in a motor vehicle accident on February 28, 2015.

623.   L.P. presented to Chesterfield less than two (2) weeks later on March 10, 2015 to initiate chiropractic treatment.

624.   L.P. told Allstate that "someone recommended me to go there" because Kleinstein "specializes when, uh, you had [an] accident and stuff like that, car accidents."

625.   L.P. confirmed that someone "from my attorney's office" called her "roughly about 3 days maybe" after the accident and directed her to Chesterfield/Kleinstein.

626.   Kleinstein referred L.P. to Midwest.

627.   Midwest submitted claims for payment and medical records relative to L.P. through the U.S. Mail upon which Allstate relied in adjusting the claims.

628.   Allstate is not required to pay Midwest for unnecessary treatment that was the result of illegal solicitation and is entitled to the return of money paid to Midwest.

## IX.   FRAUDULENT UNREASONABLE AND UNNECESSARY TREATMENT

629.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) unlicensed, and (3) unlawfully provided demonstrates their willingness to also bill for treatment that was unnecessary, unreasonable, and excessive.

630.   Moreover, but for the solicitation of patients, as discussed *supra*, these individuals would not have sought treatment with or by the defendants.

631.   The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

632.   As set out below, the defendants grossly overutilized chiropractic, physical therapy, massage therapy, injections, and MRI scans in wanton disregard for standards of care.

633.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of diagnostics, referrals, and treatment was not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

634.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was

not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

635.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 6.

636.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

### A.   IMPROPER SELF-REFERRALS

637.   The excessive treatment rendered by and the interrelationships between the various entities owned and controlled by Derek Bittner and Radom are demonstrated by the overlap of the patients at issue in this Complaint.

638.   The defendants aspired to create an all-encompassing network whereby every patient they solicited would receive direct referrals to medical providers and facilities within the Elite and later the Midwest scheme (as detailed above in section V), resulting in an excessive amount of treatment across various specialties and the billing and proceeds for all of this treatment staying within the Elite/Midwest network and flowing directly to each defendant named herein.

639.   In Derek Bittner's podcast interview, discussed *supra*, he admitted that he established an interconnected network of internal referrals when he told the host that "you just got to learn how to own the other side of the house.  So, wherever else they're spending, how do you take control of that and bring it in house?  And that's what I did for me."

640.   The defendants' success would not have been possible without the comprehensive scheme they devised and enacted, including (1) the solicitation of patients, (2) guaranteed referrals to each medical facility defendant from the other providers in the network, and (3) bogus testing results and diagnoses that were used to justify excessive amounts of treatment.

641.   Once the solicited motor vehicle accident victims became patients, the defendant medical providers endeavored to refer them for extensive treatment within the Elite/Midwest networks of intertwined, yet ostensibly independent, facilities and providers.

642.   The defendants initiated the referral protocol with chiropractic care at Bittner Chiropractic, Elite Chiropractic, or Midwest.

643.   The chiropractors at Bittner Chiropractic, Elite Chiropractic, and Midwest then made unnecessary referrals to pain management doctors at other clinics owned and controlled by Derek Bittner and Radom.

644.   Bittner Chiropractic and Elite Chiropractic referred patients to Elite Health.

645.   Midwest chiropractors` referred patients internally to pain management physicians at Midwest.

646.   In addition to performing unnecessary tests and injections, the pain management doctors provided prescriptions for physical therapy.

647.   Elite Health physicians referred patients to Elite Rehab and physical therapy clinics operating under assumed names of Elite Health (i.e., Rehabilitation of Detroit and Rehabilitation of Sterling Heights).

648.   Elite Rehab and Elite Health physical therapists referred patients back to Elite Health in order to obtain fraudulent prescriptions in order to continue receiving unnecessary physical therapy treatment.

649.   Elite Health physicians also recommended that patients continue to receive chiropractic care at Bittner Chiropractic or Elite Chiropractic.

650.   Midwest doctors referred the patients to physical therapy clinics owned and controlled by J. Rosett—the solicitor who operated AIB along with defendants Derek Bittner and Radom, as discussed *supra*.

651.   Both the chiropractors and the pain management doctors made unnecessary referrals for MRI scans.

652.   Elite Chiropractic and Elite Health referred patients to Horizon Imaging, which was owned by Radom.

653.   Midwest chiropractors and pain management doctors referred patients to Superior Imaging.

654.   Ryan Lukowski, D.C. ("Lukowski") treated patients at Elite Chiropractic and Midwest.

655.   Lukowski testified that he referred patients to MRI facilities at the direction of Derek Bittner:

> It would be like, where are we sending our patients, or where is [sic] the MRI centers we're sending them to and he probably gave me a list.  Or he didn't give me a list, he rattled off names.

656.   Lukowski confirmed that Derek Bittner "rattled off" Horizon and Superior Imaging as the MRI facilities to which he sent Elite Chiropractic and Midwest patients, respectively.

657.   The defendants did not provide patients with an option of where to receive the various forms of treatment or services.

658.   Rather, the defendants specifically referred patients only to clinics within their network.

659.   For example, Patient D.P. (Claim No. 0377639967) testified that Nicole Bittner "sets up a lot of my appointments" and that "Midwest Medical sets up my appointments."

660.  As another example, Patient K.R. (Claim No. 0252933825) testified that he saw Upfall at Elite Health, who wrote a prescription for physical therapy and gave that prescription directly to the physical therapist at Elite Rehab:

> He wrote an actual script for the therapy.  He did not give me the script.  He would give it to their doctor, to the – I'm sorry, the physical therapist, so he never handed me a script.

661.  The rampant self-referrals employed by the defendants undermine any claim that the treatment performed by them (if at all) was necessary.

662.  Indeed, there was an undeniable financial interest for the defendants to perpetuate treatment and send patients for additional (unnecessary) treatment and testing.

663.  That the defendants' pecuniary interests outweighed their obligations to provide and refer only for medically necessary treatment is demonstrated by the excessive and unjustified treatment rendered by the members of the Elite and Midwest schemes, as discussed in detail *infra*.

664.  Allowing financial considerations to supersede objective medical decision making not only has a deleterious effect on the quality of patient care and impermissibly places financial interests above patient welfare, but also constitutes unlawfully rendered treatment and fraudulently unnecessary treatment.

665.  The true interconnectedness of the defendants is not evident on the face of the documents submitted to Allstate.

666.   The defendants established multiple entities that, on the surface, appeared to operate independently because they provided different types of treatment, including chiropractic, pain management, physical therapy, and MRIs, and had different paper owners and directors.

667.   In truth, these commonly-owned clinics provided the footprint for the defendants to place patients at issue in this Complaint through a template, predetermined treatment protocol.

### B.   PREDETERMINED TREATMENT PROTOCOL

668.   Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless of the patient's reported injuries; (2) providing mirrored treatment plans further indicating that patients were subjected to a predetermined treatment protocol; and (3) listing identical short- and/or long-term goals for patients in the instances such goals were even provided.

669.   Each patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

670.   For example, Bittner Chiropractic's, Elite Chiropractic's, and Midwest's records for nearly every patient at issue in this Complaint indicate initial

examination findings of spasms, tenderness, and trigger points in the cervical, thoracic, and lumbar spine.

671.  Considering the differences in accident, age, health, and levels of fitness for the patients at issue in this Complaint, it is extremely unlikely that nearly every patient had the same issues in all three (3) spinal regions.

672.   The similarities in treatment stem from a treatment protocol developed by defendant Derek Bittner.

673.  On June 8, 2012, Derek Bittner sent three (3) Elite Chiropractic chiropractors a predetermined protocol for treatment and referring patients to Morse for legal representation:



*Fig. 7 (E-mail from Derek Bittner to Elite Chiropractic chiropractors)*

674.   Derek Bittner's e-mail confirms that patients received treatment not based upon medical need but rather based upon a predetermined protocol.

675.   The defendants also engaged in persistent symptom magnification, often times identifying symptoms and diagnoses that conflict with emergency room records.

676.   For example, in the instances where there are emergency room records, they almost always indicate that the patient suffered a minor, fairly localized injury, whereas the defendants indicate that the patients suffered more serious injuries in diffuse regions of the body.

677.   By way of example, Patient R.R. (Claim No. 0272895573) presented to Troy Hospital on January 10, 2013 after his alleged motor vehicle accident.

678.   R.R. complained of pain in his neck and pain down his left hip and leg.

679.   According to the hospital records, Troy Hospital diagnosed R.R. with a cervical strain and hip contusion, and discharged him the same day.

680.   However, when R.R. presented to Elite Chiropractic the next day for an initial evaluation, Derek Bittner reported that R.R. suffered from headaches, left knee pain, left hip pain, pain on the left side of his neck, and pain in his left shoulder, trapezius, mid-back, low-back, and buttocks.

681. Additionally, when R.R. presented to Elite Health on February 13, 2013 based on Derek Bittner's referral, Upfall reported that R.R. suffered from headaches and severe upper, middle, and lower back pain.

682. Upfall diagnosed R.R. with cervical, thoracic, and lumbar sprains, which conflicts with the assessment and diagnoses R.R. received at the hospital, which is not part of the defendants' network and thus had no reason to magnify any alleged injuries.

683. By magnifying symptoms, the defendants sought to justify referrals to the clinics in their network for unnecessary treatment and services.

684. As discussed, *supra*, the defendants engaged in a consistent, formulaic pattern of referrals to clinics owned by Derek Bittner and Radom for various treatment modalities.

685. As part of the protocol, the defendants conducted monthly patient evaluations that had no effect on treatment.

686. For example, Upfall cut and paste the same language in his medical records.

687. Upfall consistently wrote that he was "await[ing] MRI results" when the patient received the MRI scan months ago.

688.   The defendants used these monthly evaluations not to determine whether the patient actually responded to purportedly rendered treatment, but rather to continue referring the patients for unnecessary treatment and services.

689.   Despite any assessment regarding whether patients were progressing or regressing, Elite Health and Midwest physicians always renewed physical therapy during these monthly evaluations.

690.   Physicians also referred patients for unnecessary tests and procedures, which were also performed by Elite Health or Midwest.

691.   The defendants also provided disability certificates as a matter of course.

692.   Hughey testified that Derek Bittner instructed him to provide a disability certificate every month as part of the reexamination.

693.   Allstate is not required to compensate the defendants for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraudulent bills.

## C.   UNNECESSARY AND EXCESSIVE CHIROPRACTIC TREATMENT

694.   Bittner Chiropractic, Elite Chiropractic, and Midwest rendered excessive chiropractic treatment, if rendered at all, that violated chiropractic guidelines and standards of care.

695. The Guidelines for Chiropractic Quality Assurance and Practice Parameters, commonly referred to as the "Mercy Guidelines," state that "manual procedures may no longer be appropriate and alternative care should be considered" when a patient fails to show significant documented improvement after four (4) weeks.

696. If there is a lack of improvement during the first four (4) weeks of treatment, and there is no significant change in the delivery of care that is being made, then the substantiation of medical necessity of chiropractic care on and after that point in time becomes null and void.

697. Indeed, the Center for Medicare & Medicaid Services ("CMS") states that anything beyond twelve (12) visits per year is excessive, and that there is a greater likelihood that continued care is not medically indicated for any treatment beyond twenty-four (24) visits.

698. The American Chiropractic Association ("ACA") wrote a letter to CMS and agreed with the need for limitations in chiropractic treatment.

699. The ACA professed support for a national soft cap of eighteen (18) visits and a hard cap, requiring further justification, of twenty-four (24) visits.

700. Nonetheless, Bittner Chiropractic, Elite Chiropractic, and Midwest continued to render chiropractic care for months—sometimes years—on end despite the patient failing to show any improvement. *See* Exhibits 1, 3, and 5.

701.   For example, the defendants allegedly rendered chiropractic treatment to Patient R.A. (Claim No. 0328358643) for three (3) years, totaling 152 visits, without any clear benefit.  Id.

702.   Bittner Chiropractic, Elite Chiropractic, and Midwest also violated the standard of care by providing chiropractic treatment on consecutive days.

703.   Delivery of chiropractic care on consecutive dates cannot be substantiated as medically necessary unless specific sets of circumstances are identified.

704.   Bittner Chiropractic, Elite Chiropractic, and Midwest failed to identify those circumstances in their medical records.

705.   Pursuant to the predetermined protocol, the defendants scheduled appointments for patients for weeks into the future.

706.   For example, Patient M.L. (Claim No. 0434450680) told Allstate after going to Midwest for two (2) chiropractic visits that "I am scheduled for about ten more."

707.   Scheduling a patient for "about ten more" visits demonstrates that the defendants scheduled appointments and rendered treatment so as to maximize their profits and not based on the needs of the particular patient, which cannot be known weeks in advance.

708.   Allstate is not required to pay Bittner Chiropractic, Elite Chiropractic, or Midwest for medically unnecessary chiropractic treatment and it is entitled to the return of money paid in reasonable reliance on the defendants' fraudulent bills.

### D.   UNNECESSARY AND EXCESSIVE PHYSICAL THERAPY

709.   The physical therapy prescribed by Elite Health and Midwest (at the direction of Derek Bittner and Radom) and performed by Elite Rehab and Elite Health violated established standards of care.

710.   Physical therapy must be objectively indicated.

711.   That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

712.   However, Elite Health and Midwest often prescribed and Elite Rehab and Elite Health performed extensive physical therapy based upon a patient's alleged subjective symptoms alone.

713.   Elite Health and Midwest played an indispensable role in the defendants' ability to refer for excessive physical therapy.

714.   Under Michigan law for dates of service before January 1, 2015, physical therapy had to be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery. Mich. Comp. Laws § 333.17820(1).

715.   Under Michigan law for dates of service on or after January 1, 2015, physical therapy treatment lasting more than twenty-one (21) days or ten (10) treatment sessions (whichever occurs first) must be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Id.

716.   Elite Health and Midwest repeatedly made misrepresentations regarding the necessity for physical therapy, including almost every time each wrote a prescription for physical therapy, to perpetuate unnecessary and expensive treatment that falsely bolstered and inflated the value of the insurance claim.

717.   Numerous patients at issue in this Complaint received physical therapy treatment that lasted far beyond twenty-one (21) days or ten (10) treatment sessions and received numerous prescriptions for physical therapy from physicians at Elite Health and Midwest to continue treatment far beyond a reasonable time.

718.   These false prescriptions were submitted to Allstate through interstate wires and the U.S. Mail along with demands for payment.

719.   Physicians at Elite Health and Midwest often wrote the physical therapy prescription during the initial evaluation for the patients at issue in this Complaint.

720.   In approximately ninety percent (90%) of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

721.   This fact supports that the immediate resort to physical therapy, as often happened due to Elite Health and Midwest writing physical therapy prescriptions as a matter of course, was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

722.   Further, Elite Health and Midwest routinely renewed prescriptions for physical therapy for several months.

723.   The defendants did not consider the patients' response to physical therapy treatment in order to alter or manage their patients' care.

724.   Instead, the defendants' repeated renewals of physical therapy prescriptions were merely part of their predetermined treatment protocol.

725.   As with the chiropractic treatment discussed *supra*, the physical therapy treatment rendered at Elite Rehab and Elite Health rarely varied from patient to patient, evidencing that treatment was rendered pursuant to a predetermined protocol that was not individualized to each patient's clinical symptoms and needs.

726.   The principal of physical therapy is to initiate treatment, educate the patient on how to perform exercises safely and properly, and enable the patient to graduate towards a home exercise program.

727.   The defendants rendered physical therapy far beyond any reasonable expectation.

728.   The defendants also provided multiple modalities without any specific rationale for their application.

729.   The defendants also rendered physical therapy to patients at issue in this Complaint who were allegedly receiving chiropractic care at the same time as the physical therapy.

730.   Concurrent physical therapy and chiropractic treatment is not necessary if either is properly provided as both use largely the same treatment modalities.

731.   Indeed, patients at issue in this Complaint received the exact same treatment modalities on the same day from both chiropractors and physical therapists, as discussed in more detail *infra*.

732.   Providing the same treatment to the same patient on the same date is not only excessive, but redundant.

733.   Allstate is not required to pay Elite Rehab or Elite Health for medically unnecessary physical therapy treatment and it is entitled to the return of money paid in reasonable reliance on the defendants' fraudulent bills.

### E.   UNNECESSARY AND EXCESSIVE INJECTIONS

734.   Elite Health and Midwest billed Allstate for excessive, unnecessary, and unreasonable injections.

735. The performance of invasive procedures (such as injections) for the relief of pain must be based upon an adequate diagnosis and legitimate medical necessity.

736. Derek Bittner testified that he referred Elite Chiropractic patients to Elite Health for injections based upon their subjective complaints and not objective medical findings.

737. Midwest repeatedly recommended injections to patients even when not medically necessary.

738. Elite Health and Midwest also inappropriately performed epidural steroid injections as an initial procedure solely because they could bill more for epidural steroid injections.

739. Generally, patients with myofascial/musculoskeletal pain receive trigger point injections as the first step.

740. This was almost never done by the defendants.

741. Rather, the defendants immediately performed epidural steroid injections as the first step, which are billed at a much higher rate than trigger point injections.

742. Elite Health and Midwest also unnecessarily billed Allstate for injections performed at multiple levels when it was appropriate to perform the procedure with only one (1) injection at one (1) level.

743. The defendants did this so that they could bill Allstate at a higher rate.

744. Patients unnecessarily underwent bilateral or multilateral transforaminal injections instead of a simple one (1) needle interlaminar epidural steroid injection.

745. The rationale for a transforaminal injection is to specifically target one (1) location that correlates with the particular radicular symptoms.

746. When there are multiple levels of disease or bilateral symptoms, the standard approach is to perform a single interlaminar injection and the volume of injectate spreads to both sides of the epidural space and to multiple levels.

747. Instead, the defendants performed bilateral transforaminal injections— sometimes at multiple levels—which accomplishes the same effect but allows for higher reimbursement given the greater number of needles placed.

748. The defendants also performed unnecessary facet injections.

749. For example, the defendants performed facet injections without the use of a steroid, which makes the injection of no therapeutic value.

750. Performing medically unnecessary injections also placed the patients at risk for injury.

751. For example, Patient T.S. (Claim No. 0225944487) testified that the last time she received injections at Elite Health, "instead of the doctor just doing it

that one spot, he did it in four parts across my back and it actually paralyzed my whole right side."

752.   T.S. testified further that the paralysis lasted "about a month and-a-half."

753.   Elite Health and Midwest also placed patients at risk by unnecessarily and inappropriately performing injections under anesthesia.

754.   It is clearly recognized to not perform these procedures under anesthesia because the pain management physician needs the patient not to be sedated so that the patient can respond and inform the practitioner if there is a negative response.

755.   Performing sedation for the injections performed by Elite Health and Midwest is unnecessary and dangerous.

756.   According to the American Society of Anesthesiologists, performing these procedures under anesthesia puts patients at risk.

757.   Elite Health and Midwest also consistently failed to document the patients' response to pain procedures.

758.   Rather, the defendants performed series of injections without ever recording how the patient responded to the initial injection or whether it alleviated the patient's pain.

759.   The failure to document the patients' response confirms the unnecessary nature of the injections.

760.   Allstate is not required to pay Elite Health or Midwest for medically unnecessary injections and it is entitled to the return of money paid in reasonable reliance on the defendants' fraudulent bills.

## F.   UNNECESSARY AND EXCESSIVE MRIs

761.   The defendants ordered excessive and unnecessary MRI scans as part of the predetermined treatment protocol.

762.   Superior Imaging engaged in a consistent pattern of performing MRI scans of the cervical, thoracic, and lumbar spine without any of the necessary associated findings to justify the need for an MRI scan.

763.   Moreover, there was a consistent lack of follow-up on the MRI results.

764.   The ordering chiropractors and physicians rarely, if ever, documented the results of the MRI scan in their subsequent treatment notes, demonstrating that the MRI was performed not based on the medical necessity but as a means to maximize the defendants' profits.

765.   Furthermore, the treatment rendered to the patients at issue in this Complaint did not change after the patient received the MRI scan.

### 1.   Standard of Care for MRI Imaging

766.   In addition to being illegal and improper due to the circumstances of the referrals, as set forth above, the MRIs performed by Superior Imaging were rarely, if ever, medically necessary.

767.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

768.   Superior Imaging explicitly referred to the ACR on its website:



*Fig. 8 (image from Superior Imaging website)*

769.   Thus, Superior Imaging holds itself out as a facility that adopts and adheres to the ACR's standards.

770.   According to the ACR, an MRI should only be ordered after a physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

771.    For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

772.    The ACR's practice parameters also state that a basic neurological examination should be done and recorded prior to an MRI of the brain or spinal region.

773.    Prior to referring a patient for an MRI to rule out damage to spinal nerve roots and/or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light toughing).

774.    Physicians and chiropractors at Midwest who made referrals to Superior Imaging, including Nicole Bittner, routinely failed to perform these ACR-required examinations.

775.    Superior Imaging had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

776.    The ACR also promulgates specific "Appropriateness Criteria" rating the circumstances in which various types of imaging studies are proper in light of a patient's presenting symptoms and history.

777.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic neck pain, including when the patient has a history of trauma or prior surgery.

778.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

779.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" to perform an MRI, and again only when pain persists following failure of conservative care.

780.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

781.   Further, performance of cervical spine MRIs with use of a contrast agent only rises above the "usually not appropriate" direction of the ACR when "[r]adiographs show disc margin destruction or bone lesion suggestive of infection or malignancy."

782.   MRIs should not be ordered in violation of the ACR Practice Parameters unless there is an overriding clinical reason in the specific case and that reason must be documented in the patient's medical record.

783.   Nicole Bittner and the other chiropractors and physicians at Midwest who made referrals to Superior Imaging never documented an overriding clinical reason for the MRIs ordered outside of the ACR Practice Parameters.

784.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

785.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinical problem or question) to obtain the missing information.

786.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

787.   Defendant Superior Imaging never had such information nor made an attempt to obtain it, in clear violation of the ACR guidelines to which it says it adheres.

788.   MRI findings may be misleading if not closely correlated with the clinical history, clinical examination, or physiologic tests.

789.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

790.   Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

791.   Pursuant to the ACR guidelines, it is the responsibility of Superior Imaging to assure that all MRIs referred to it are proper.

792.   As set forth below, rather than perform the duties required by the ACR, the defendants routinely ordered and performed excessive and medically unnecessary MRIs in order to increase the amount of reimbursement sought from Allstate.

793.   The exemplar claims set forth in Section IX.I detail the medically unnecessary MRIs that were ordered by Midwest, and performed by Superior Imaging, in violation of the ACR Practice Parameters to which Superior Imaging holds itself out as following.

## 2.   MRIs Performed During Initial Stages of Treatment

794.   MRIs at issue herein were routinely ordered at the onset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

795.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

796.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

797.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurologic injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

798.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

799.   Superior Imaging routinely performed MRIs of patients who had only just initiated treatment.

800.   More than 74% of the patients at issue herein who received an MRI at Superior Imaging did so within three (3) months of their alleged motor vehicle accident.

801.   Patients at Superior Imaging had multiple MRI scans performed as soon as just two (2) weeks after their alleged motor vehicle accidents.

802.   For example, Patient A.J. (Claim No. 0399815900) was allegedly involved in a motor vehicle accident on January 26, 2016, was allegedly examined by Nicole Bittner on February 2, 2016, and underwent MRI imaging of two (2) body parts on February 8 and 11, 2016.

803.   It is not possible that patients who underwent MRIs just days after their alleged motor vehicle accidents attempted conservative treatment—as required by the ACR—before resorting to MRI scans.

804.   The patients at issue herein who received MRIs at Superior Imaging within the first weeks after their alleged motor vehicle accident injuries had non-emergent medical conditions, not the type of fracture or neurological injury that

would justify overriding the ACR's directives to attempt conservative treatment before imaging.

### 3.    Excessive MRI Scans

805.   In addition to performing MRIs as soon as possible after an alleged accident in violation of the standard of care, Superior Imaging also sought to maximize the amount of the charges submitted to Allstate by performing far more MRIs than were medically necessary.

806.   MRIs should be limited to only the symptomatic body part and it is uncommon to order MRIs on more than one region.

807.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2017, which documents that just 12.3% (101,714 of 826,502) of all patients underwent MRIs of multiple body parts on the same date of service.

808.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

809.   Superior Imaging exclusively performs MRIs in a non-emergent setting, usually to purportedly diagnose soft-tissue injuries.

810.    By comparison, in 2017, Superior Imaging performed multiple MRIs at more than five (5) times the statewide average, with 73% of patients receiving multiple MRIs on the same date of service.  *See* Exhibit 6.

811.    The extreme number of MRIs per patient performed by Superior Imaging is illustrated on the chart below:



812.    Scans of multiple body parts in the number and at the rate performed by Superior Imaging are exceptionally rare.

813.    Moreover, Superior Imaging often performed MRIs of the same patient that were just weeks apart, which obscures the true number of MRIs performed per patient by Superior Imaging in the data reported to the State of Michigan.

814.    Patients at issue herein underwent as many as seven (7) separate MRIs at Superior Imaging, with at least twenty-seven (27) patients who underwent three (3) or more MRIs at Superior Imaging.  *See* Exhibit 6.

815.    Superior Imaging also performed MRI scans on areas of the body that were not ordered by the referring physician.

816.    For example, Patient R.S. (Claim No. 0417268182) presented to Midwest on December 20, 2016 for an initial evaluation with Orlewicz, who then ordered an MRI scan of R.S.'s right knee.

817.    Superior Imaging billed Allstate for MRI scans of R.S.'s right knee and thoracic spine.

818.    However, Orlewicz never ordered an MRI of R.S.'s thoracic spine.

819.    Performing an MRI scan of an area of the body that is not symptomatic is medically unnecessary and excessive.

820.    Performing an MRI scan without a prescription is unlawful.

821.    Superior Imaging also performed brain MRI scans without any clinical findings to justify the need for the scan.

822.    Brain MRI guidelines direct reserving imaging for patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

823. However, the defendants ordered and Superior Imaging performed brain MRI scans after an initial consult with neurologists based only on subjective complaints of headaches.

824. Allstate is not required to pay Superior Imaging for excessive and unnecessary MRI scans or for MRI scans performed without a prescription.

### G. UNNECESSARY AND EXCESSIVE MASSAGE THERAPY

825. Elite Chiropractic and Midwest billed Allstate for unnecessary and unreasonable massage therapy.

826. Draplin testified that the on-site massage therapist, "Jasmine," provided massage therapy in the Detroit office.

827. "Jasmine" is Jazmine Ateman, who rendered unlicensed massage therapy at Elite Chiropractic and Midwest, as discussed *supra*.

828. Draplin testified that massage therapy was not part of the treatment plan:

> Q. How is it decided whether and if and when a patient would get a massage?
>
> A. It was up to the patient.
>
> Q. So the massage was not part of the treatment plan?
>
> A. It was not.

829. Massage therapy rendered at the request of the patient—and not based on medical necessity—is clearly unnecessary and unreasonable.

830.   Allstate is not required to pay Elite Chiropractic or Midwest for unnecessary and unreasonable massage therapy treatment.

**H.   DUPLICATIVE TREATMENT**

831.   Elite Chiropractic, Elite Rehab, and Elite Health billed Allstate for the same treatment performed on the same patient on the same date of service at the same clinic.

832.   Performing the same treatment modality on the same date is medically unnecessary and constitutes excessive and unreasonable treatment.

833.   The three (3) entities knew of the duplicative treatment rendered by the other clinics because they all operated out of the same location and were owned by the same people (Derek Bittner and Radom).

834.   For example, Patient W.B. (Claim No. 0285026456) initiated chiropractic treatment at Elite Chiropractic on September 20, 2013.

835.   W.B. began receiving physical therapy at Rehabilitation of Detroit (an assumed name of Elite Health) beginning on December 11, 2013.

836.   Elite Chiropractic and Elite Health both allegedly rendered treatment to W.B. at the Detroit office of the Elite entities.

837.   W.B. allegedly received concurrent chiropractic and physical therapy through April 2014 (i.e., for over four (4) months).

838.  W.B. purportedly received treatment from Elite Chiropractic and Elite Health on the same date of service fifteen (15) times.

839.  Elite Chiropractic and Elite Health billed for the same modalities on nine (9) of these fifteen (15) dates:

| Treatment Date | Elite Chiropractic CPT Code | Elite Health CPT Code |
|---|---|---|
| 12/11/2013 | 97010 | 97010 |
| 12/31/2013 | 97110 | 97110 |
| 1/22/2014 | 97110 | 97110 |
| 1/27/2014 | 97110 | 97110 |
|  | 97140 | 97140 |
| 2/4/2014 | 97010 | 97010 |
|  | 97110 | 97110 |
| 2/24/2014 | 97010 | 97010 |
| 3/4/2014 | 97010 | 97010 |
|  | 97110 | 97110 |
| 3/10/2014 | 97010 | 97010 |
| 3/17/2014 | 97010 | 97010 |
|  | 97110 | 97110 |

840.  It is medically unnecessary and redundant for multiple clinics to provide—and bill—for the application of multiple hot/cold packs and the performance of therapeutic exercises on the same date of service to the same patient.

841.  Elite Chiropractic and Elite Health billed Allstate $2,310 for duplicative treatment supposedly rendered to W.B. that was of no medical benefit to him.

842.  Allstate is not required to pay Elite Chiropractic, Elite Rehab, or Elite Health for duplicative and unnecessary treatment.

## I.   EXEMPLAR PATIENTS

843.   The defendants' fraudulent billing for unnecessary chiropractic, physical therapy, massage therapy, injections, and MRI scans is exemplified by the following representative patients.

### 1.   Patient R.M. (Claim No. 0419189253)

844.   Patient R.M. was allegedly involved in a motor vehicle accident on June 29, 2016.

845.   R.M. presented to Midwest on July 8, 2016 to initiate chiropractic treatment with Nicole Bittner.

846.   Like almost every patient at issue in this Complaint, Nicole Bittner found alleged spasms, tenderness, and trigger points in R.M.'s cervical, thoracic, and lumbar spine.

847.   R.M. presented to Rehabilitation Medical Specialists, PLLC on July 25, 2016 for an appointment with Antoine Geffrard, M.D.

848.   R.M. was an established patient with Dr. Geffrard prior to the motor vehicle accident.

849.   Dr. Geffrard noted on July 25, 2016 that R.M. stated "that an attorneys firm called him following his accident.  He states that they directed him to a chiropractor for care and subsequently to a pain specialist.  He states that the chiropractor is at Midwest Medical Clinic and the doctor there has engaged [in]

chiropractic treatments on him that are causing him pain.  He also states that he is being routed to a pain specialist, but he has declined that visit up to this point."

850.   Chiropractic treatment that causes a patient pain is medically unnecessary and violates the standard of care.

851.   R.M. returned to Dr. Geffrard on August 29, 2016.

852.   Dr. Geffrard noted that R.M. was being instructed by the chiropractor at Midwest—Nicole Bittner—to misrepresent his injuries:

> He tells me today that the chiropractor wants to misrepresent his injuries by indicating that his low back pain is associated with this accident.  The patient himself denies this and there is no evidence in my records based on the patient's history that he has had any new change in his preexisting back pain.  He states the chiropractor wanted to engage in some chiropractic adjustments because of this.  He states that he is resisting and is afraid that he is going to be overtreated by the practitioners at Midwest Medical Clinic.

853.   R.M. received a total of thirteen (13) chiropractic treatment sessions from July 8, 2016 through September 14, 2016.

854.   Midwest and Nicole Bittner assessed R.M. as "stable," feeling the "same as last visit," or "worse" than before receiving treatment.

855.   R.M. therefore never improved from any chiropractic treatment received at Midwest.

856.   R.M. returned to Dr. Geffrard on September 26, 2016.

857.   R.M. told Dr. Geffrard that Midwest "continue[s] to call him and try to route him back into their care, though he has declined to do so."

858.   Midwest and Nicole Bittner submitted claims for payment and accompanying medical records relative to R.M. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

859.   Allstate is not required to pay Midwest or Nicole Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to R.M. and is entitled to the return of money paid to Midwest.

### 2.    Patient S.B. (Claim No. 0250692456)

860.   Patient S.B. was allegedly involved in a motor vehicle accident on July 2, 2012.

861.   S.B. allegedly presented to Bittner Chiropractic on July 3, 2012 to initiate chiropractic treatment with Derek Bittner.

862.   Bittner Chiropractic and Derek Bittner submitted a bill to Allstate through the U.S. Mail for services allegedly rendered on July 3, 2012.  *See* Exhibit 43.

863.   Elite Chiropractic also submitted a bill to Allstate seeking payment for services purportedly rendered to S.B. on that same date.  *See* Exhibit 44.

864. Bittner Chiropractic and Derek Bittner billed Allstate using CPT Code 99204, claiming they performed a Level Four initial patient evaluation. *See* Exhibit 43.

865. Elite Chiropractic, however, billed Allstate using CPT Code 99205, claiming that Lukowski performed a Level Five initial patient evaluation. *See* Exhibit 44.

866. Bittner Chiropractic and Elite Chiropractic both billed Allstate for performing x-rays, rendering mechanical traction, and applying a hot or cold pack. *Compare* Exhibit 43 *with* Exhibit 44.

867. Receiving the same treatment more than once on the same date of service is unnecessary, redundant, and excessive.

868. Like almost every patient at issue in this Complaint, Lukowski found alleged spasms, tenderness, and trigger points in S.B.'s cervical, thoracic, and lumbar spine.

869. S.B. returned to Bittner Chiropractic on July 5, 2012.

870. Bittner Chiropractic and Derek Bittner allegedly applied a hot or cold pack, performed chiropractic manipulative treatment, and rendered mechanical traction. *See* Exhibit 45.

871. S.B. allegedly received the exact same services from Lukowski at Elite Chiropractic on the same day. *Compare* Exhibit 45 *with* Exhibit 46.

872.   Receiving the same treatment twice on the same day is unnecessary, redundant, and excessive, if it was rendered at all.

873.   S.B. returned to Bittner Chiropractic the next day on July 6, 2012.

874.   Again, Bittner Chiropractic and Derek Bittner allegedly applied a hot or cold pack, performed chiropractic manipulative treatment, and rendered mechanical traction.  *See* Exhibit 47.

875.   Performing chiropractic manipulative treatment on consecutive days violates the chiropractic standard of care unless the chiropractor documents the medical necessity for performing such treatment on back-to-back days.

876.   The medical records for July 6, 2012 provide no such indication.

877.   Therefore, Bittner Chiropractic and Derek Bittner violated the standard of care.

878.   Moreover, S.B. allegedly received the exact same services from Lukowski at Elite Chiropractic on July 6, 2012.  *Compare* Exhibit 47 *with* Exhibit 48.

879.   Bittner Chiropractic, Elite Chiropractic, and Derek Bittner submitted claims for payment and accompanying medical records relative to S.B. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

880.   Allstate is not required to pay Bittner Chiropractic, Elite Chiropractic, or Derek Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to S.B. and is entitled to the return of money paid to Bittner Chiropractic and Elite Chiropractic.

### 3.   Patients L.M. and W.B. (Claim No. 0285026456)

881.   Patient L.M. was allegedly involved in a motor vehicle accident on May 5, 2013.

882.   L.M. initiated physical therapy at Standard Medical, Inc. ("Standard Medical") on May 7, 2013.

883.   Standard Medical discharged L.M. on August 9, 2013.

884.   Despite completing three (3) months of physical therapy, L.M. presented to Elite Chiropractic on September 20, 2013 for an initial evaluation with Draplin.

885.   Like nearly every patient at issue in this Complaint, Elite Chiropractic found alleged spasms, tenderness, and trigger points in L.M.'s cervical, thoracic, and lumbar spine.

886.   Beginning October 14, 2013, L.M. reported suffering only slight pain in his neck and low back, and occasionally in his mid-back.

887.   Elite Chiropractic performed a reevaluation on October 21, 2013.

888.   Elite Chiropractic made no change in the treatment rendered to L.M. despite him now reporting only slight pain.

889.   Elite Chiropractic assessed L.M. as stable and improving with treatment.

890.   Despite this assessment, Draplin unnecessarily referred L.M. to Elite Health for pain management.

891.   L.M. presented to Elite Health on December 5, 2013 for an initial evaluation with Upfall.

892.   According to Upfall, L.M. suffered from severe pain in his upper, middle, and lower back.

893.   Upfall's report of L.M.'s pain conflicts with that reported by Elite Chiropractic.

894.   Upfall noted that L.M. suffered from bilateral shoulder discomfort and a possible rotator cuff tear.

895.   However, Upfall never examined L.M.'s shoulders.

896.   Furthermore, L.M. never reported any shoulder discomfort to Elite Chiropractic.

897.   Pursuant to the defendants' protocol, Upfall referred L.M. to Rehabilitation of Detroit—an assumed name for Elite Health—for physical therapy.

898.   L.M. began physical therapy at Elite Health on December 11, 2013.

899.   L.M. returned to Elite Health on January 23, 2014 for an established patient evaluation with Upfall.

900.   Upfall again noted an impression of bilateral shoulder discomfort and a possible rotator cuff tear without examining L.M.'s shoulders.

901.   Despite reporting reduced pain levels since the initial evaluation, Upfall still referred to L.M.'s pain as "severe."

902.   Upfall's report of "severe" pain conflicts with the chiropractic and physical therapy records.

903.   Despite the reduced pain, Upfall recommended that L.M. continue physical therapy.

904.   L.M. presented to Pain Specialists of Michigan—an assumed name for Elite Health—on March 7, 2014 for an initial patient evaluation with Mark Juska, M.D. ("Juska").

905.   According to Juska's records, Upfall referred L.M.

906.   However, Upfall's records make no mention of the referral, which supports that this referral was unnecessary and conducted as part of the defendants' predetermined *pro forma* protocol to bill Allstate for as many procedures and treatment modalities as possible.

907.   Juska reported that L.M. suffered from low back pain, neck pain, and headaches.

908.   Juska's report of headaches conflicts with the physical therapy, chiropractic, and pain management records to date.

909.   L.M. continued chiropractic care and physical therapy, and the records indicate that L.M. felt slight pain and improved from treatment.

910.   Despite reportedly improving from conservative treatment, Juska performed bilateral facet medial branch block injections on L.M. on April 10, 2014.

911.   Additionally, Juska performed this procedure with anesthesia services, which was unnecessary.

912.   Despite continuing chiropractic care and physical therapy with reported improvements, Juska performed a second set of bilateral facet medial branch block injections on L.M. on June 3, 2014.

913.   Juska again performed this procedure with unnecessary anesthesia services.

914.   L.M. underwent a total of 68 chiropractic and 33 physical therapy sessions, which was excessive and unnecessary.

915.   L.M. received concurrent physical therapy and chiropractic treatment, which is unnecessary, redundant, and in violation of the standard of care.

916.   In fact, L.M. allegedly received both chiropractic care and physical therapy on the same day on twenty-four (24) dates of service.

917.   Elite Chiropractic and Elite Health both billed Allstate using CPT Code 97010—purporting to both apply a hot or cold pack to L.M.—on the same date sixteen (16) times.

918.   Elite Chiropractic and Elite Health both billed Allstate using CPT Code 97140—alleging to both perform manual therapy on L.M.—on the same date four (4) times.

919.   Elite Chiropractic and Elite Health both billed Allstate using CPT Code 97110—claiming to supervise L.M.'s performance of therapeutic exercises—on the same date seven (7) times.

920.   Performing the same treatment modality to the same patient multiple times on the same date is medically unnecessary and excessive.

921.   Moreover, L.M.'s father, Patient W.B. (Claim No. 0285026456), was involved in the same motor vehicle accident and received the same treatment protocol.

922.   Like his son, W.B. initiated chiropractic treatment on September 20, 2013.

923.   At that time, L.M. allegedly reported pain in his neck, mid-back, and low back, and W.B. supposedly reported pain in his neck and low back.

924.   Like L.M., W.B. also presented to Elite Health for an initial evaluation with Upfall on December 5, 2013.

925.   W.B. also initiated physical therapy at Elite Health on the same date as L.M.

926.   The fact that L.M. and W.B. received the same referrals and presented to the various clinics on the same dates despite suffering different injuries, being different ages, and having different pre-accident conditions demonstrates that the treatment they allegedly received was part of a predetermined protocol.

927.   Elite Chiropractic and Elite Health submitted claims for payment and accompanying medical records relative to L.M. and W.B. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

928.   Allstate is not required to pay Elite Chiropractic or Elite Health for the fraudulent, unnecessary, and unreasonable treatment rendered to L.M. and W.B. and is entitled to the return of money paid to Elite Chiropractic and Elite Health.

### 4.   Patient C.P. (Claim No. 0309978995)

929.   Patient C.P. was allegedly involved in a motor vehicle accident on December 19, 2013.

930.   C.P. presented to Poirier Chiropractic Inc. ("Poirier Chiropractic") the next day.

931.   C.P. received chiropractic treatment at Poirier Chiropractic from December 20, 2013 through June 14, 2014.

932.   On December 12, 2014, Poirier Chiropractic sent Allstate a letter stating that C.P.'s medical condition was stabilized as of June 30, 2014, and that the clinic would see her on an as-needed basis.  *See* Exhibit 49.

933.   C.P. presented to Midwest on December 10, 2014, two (2) days before Poirier Chiropractic sent its letter to Allstate and nearly one (1) year after the alleged motor vehicle accident.

934.   Like virtually every patient at issue in this Complaint, Nicole Bittner found spasms, tenderness, and trigger points in C.P.'s cervical and lumbar spine.

935.   Nicole Bittner allegedly rendered chiropractic treatment to C.P. at Midwest on more than forty (40) dates of service from December 10, 2014 through February 4, 2016.

936.   Midwest therefore billed Allstate for chiropractic treatment provided nineteen (19) months after Poirier Chiropractic found C.P.'s condition to have stabilized.

937.   Midwest and Nicole Bittner submitted claims for payment and accompanying medical records relative to C.P. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

938.   Allstate is not required to pay Midwest or Nicole Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to C.P. and is entitled to the return of money paid to Midwest.

### 5.   Patient Y.W. (Claim No. 0228856902)

939.   Patient Y.W. was allegedly involved in a motor vehicle accident on December 10, 2011 and presented to Detroit Receiving Hospital that same day.

940.   According to the emergency room records, Y.W. presented to the hospital with complaints of neck and lumbar back pain.

941.   Y.W. presented to Elite Chiropractic three (3) days later on December 13, 2011 to initiate chiropractic treatment with Derek Bittner.

942.   Elite Chiropractic reported that Y.W. complained of headaches and pain in her neck, trapezius, both shoulders, both elbows, right wrist, right hand, right fingers, mid-back, low-back, buttocks, right hip, both ankles, and both feet.

943.   These magnified symptoms conflict with the emergency room records from just three (3) days earlier.

944.   Like virtually every patient at issue in this Complaint, Derek Bittner found alleged spasms, tenderness, and trigger points in Y.W.'s cervical, thoracic, and lumbar spine.

945.   Pursuant to the defendants' protocol, Derek Bittner referred Y.W. to Elite Health.

946.   Y.W. presented to Elite Health on January 23, 2012 for an initial evaluation with Honet and received a prescription for physical therapy.

947.   One (1) week later, on January 30, 2012, Honet performed an epidural steroid injection.

948.   Y.W. had not yet started physical therapy at that time.

949.   Performing an injection before attempting more conservative treatment methods, such as physical therapy, is in violation of the standard of care.

950.   Y.W. initiated physical therapy at Elite Rehab on February 1, 2012.

951.   Y.W. returned to Elite Health on February 13, 2012 for a second epidural steroid injection.

952.   Honet noted that "[t]he 1st one did not really give much relief.  We will try another one, and if she does not get good relief, we will try a transforaminal [injection]."

953.   Performing a second epidural steroid injection after the first injection was ineffective is medically unnecessary and violates the standard of care.

954.   Compounding the issue, Y.W. received a third epidural steroid injection from Honet on March 5, 2012.

955.   Honet wrote that "[e]pidurals in the past decreased pain, improved function, and improved quality of life."

956.   However, this conflicts with his own record from February 13, 2012.

957.   Y.W. returned to Elite Health on April 13, 2012 for an established patient evaluation with Honet, who recommended that Y.W. continue chiropractic care and physical therapy.

958.   Y.W. presented on May 30, 2012 for an independent medical evaluation.

959.   Y.W. discussed her chiropractic treatment with the independent medical evaluator and told him that the treatment resulted in making her pain subjectively worse and that her back was "killing her."

960.   Elite Chiropractic billed Allstate for purportedly rendering chiropractic treatment to Y.W. on 116 visits over the course of more than two (2) years from December 13, 2011 to December 20, 2013, which was unnecessary and excessive.

961.   Elite Rehab billed Allstate for supposedly providing physical therapy treatment to Y.W. on 66 visits for over a year from February 1, 2012 through February 7, 2013.

962.   Y.W. then stopped receiving physical therapy at Elite Rehab and began treating at Rehabilitation of Detroit, which is an assumed name of Elite Health.

963.   Elite Health billed Allstate for allegedly providing physical therapy treatment to Y.W. on thirty-nine (39) visits from February 11, 2013 through October 2, 2013.

964.   Physical therapy rendered over the course of 105 visits lasting more than a year-and-a-half is unnecessary and excessive.

965.   Y.W. also received chiropractic and physical therapy concurrently, which is unnecessary, redundant, and in violation of the standard of care.

966.   In fact, Y.W. allegedly received both chiropractic care and physical therapy on the same day on 50 dates of service.

967.   Elite Chiropractic and either Elite Rehab or Elite Health both billed Allstate using CPT Code 97010—purporting to both apply a hot or cold pack to Y.W.—on the same date forty-two (42) times.

968.   Elite Chiropractic and either Elite Rehab or Elite Health both billed Allstate using CPT Code 97110—claiming to supervise Y.W.'s performance of therapeutic exercises—on the same date seven (7) times.

969.   Performing the same treatment modality to the same patient multiple times on the same date is medically unnecessary and excessive.

970.   Elite Chiropractic, Elite Health, Elite Rehab, and Derek Bittner submitted claims for payment and accompanying medical records relative to Y.W. to Allstate through the U.S. Mail and interstate wires seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

971.   Allstate is not required to pay Elite Chiropractic, Elite Health, Elite Rehab, or Derek Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to Y.W. and is entitled to the return of money paid to Elite Chiropractic, Elite Health, and Elite Rehab.

### 6.   Patient D.M. (Claim No. 0358275519)

972.   Patient D.M. was allegedly involved in a motor vehicle accident on February 3, 2015.

973.   D.M. testified that he returned to his house after the motor vehicle accident and spent the remainder of the day trying to finish moving into a new home.

974.   D.M. presented to Chesterfield on February 10, 2015 to initiate chiropractic treatment with Kleinstein.

975.   D.M. testified that his attorney referred him to see Kleinstein:

Q.   Who referred you to him?

A.   My lawyer

. . .

Q.   They recommended over the phone that you go to this chiropractor; is that right?

A.   Yes.

976.   Kleinstein referred D.M. to Midwest to see a pain management physician.

977.   D.M. presented to Midwest on June 18, 2015 for an initial patient evaluation with Siva Sripada, D.O. ("Sripada").

978.   Sripada's medical records for this visit incorrectly identify the date of the motor vehicle accident as March 19, 2015, and include the incorrect date of birth for D.M.

979.   Furthermore, the medical records state that D.M. went to Beaumont Hospital, which is false as D.M. testified that he did not go to the hospital.

980.   Sripada's medical records include information not at all related to D.M.; rather, Sripada included information relevant to another patient with the same name.

981.   D.M. testified that "[t]hey kept getting our files mixed up" and that D.M. knew this because "they done [sic] told me that a couple of times and I met him.  We rode in transportation a few times together."

982.   However, the other patient did not present to Midwest for an initial evaluation until July 17, 2015—nearly one (1) month after D.M.'s initial evaluation.

983.   Therefore, no justification exists for Sripada to include the wrong information in the record for D.M.'s initial evaluation.

984.   D.M. returned to Midwest on July 27, 2017 for an established patient evaluation.

985. Sripada noted that D.M. had a "small tear in his shoulder and also some tendonitis."

986. Sripada also noted that D.M. had "been undergoing physical therapy and he definitely reports that it is helping."

987. Despite noting the patient's positive response to conservative treatment methods, Sripada offered D.M. an injection into his shoulder.

988. Providing an injection when a patient is responding to conservative treatment, such as physical therapy, is in violation of the standard of care.

989. Midwest submitted claims for payment and accompanying medical records relative to D.M. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

990. Allstate is not required to pay Midwest for the fraudulent, unnecessary, and unreasonable treatment rendered to D.M. and is entitled to the return of money paid to Midwest.

### 7.   Patient D.R. (Claim No. 0265660183)

991. Patient D.R. was allegedly involved in a motor vehicle accident on November 5, 2012.

992. D.R. presented to Bittner Chiropractic on January 3, 2013 to initiate chiropractic treatment with Derek Bittner.

993.   According to Bittner Chiropractic, D.R. complained of headaches and pain in her neck, trapezius, right hand, right fingers, mid-back, low back, and left hip.

994.   These exaggerated symptoms differ drastically from the symptoms D.R. reported to her primary care physician and the emergency room medical staff.

995.   Like almost every patient at issue in this Complaint, Derek Bittner found alleged spasms, tenderness, and trigger points in D.R.'s cervical, thoracic, and lumbar spine.

996.   Bittner Chiropractic and Derek Bittner provided chiropractic treatment to D.R., and ultimately referred D.R. to Elite Health.

997.   D.R. returned to her primary care physician on January 16, 2013 to discuss a pap smear abnormality.

998.   The primary care physician's records lack any mention of D.R. reporting any pain on this visit.

999.   Indeed, the primary care physician noted that D.R. was in no acute distress.

1000.   Nonetheless, D.R. presented to Elite Health on March 6, 2013 for an initial evaluation with Upfall, who reported alleged headaches and severe pain in her upper, middle, and lower back, as well as bilateral hip pain.

1001. However, D.R. allegedly also presented to Bittner Chiropractic that same day (March 6, 2013).

1002. According to Bittner Chiropractic, D.R. did not report any headaches, nor any pain in her mid-back or right hip.

1003. Upfall noted that D.R. denied loss of consciousness as part of the motor vehicle accident.

1004. Despite never performing an examination of D.R.'s head, Upfall diagnosed D.R. with a traumatic brain injury and recommended that she see a neurologist.

1005. Upfall also recommended that D.R. continue chiropractic treatment and start physical therapy.

1006. On March 11, 2013, D.R. initiated physical therapy at Rehabilitation of Sterling Heights (an assumed name for Elite Health).

1007. D.R. returned to Elite Health on May 29, 2013 for an established patient visit with Upfall.

1008. According to Upfall, D.R. reported headaches and severe pain in her upper, middle, and lower back, as well as both shoulders and both hips.

1009. However, D.R. purportedly presented to Bittner Chiropractic on the same day, and did not report any headaches, nor any pain in her shoulders, mid-back, or right hip.

1010. Upfall continued to include in his template records that D.R. suffered from a traumatic brain injury.

1011. Upfall noted that D.R. "treated with her neurologist awaiting records" despite the fact that D.R. had not seen a neurologist as of May 29, 2013.

1012. On July 2, 2013, D.R. presented to Pioneer Neurology Group (an assumed name of Elite Health) for an initial patient evaluation with neurologist Norman Burns, M.D. ("Burns").

1013. Burns recommended that D.R. continue physical therapy and chiropractic care, and referred D.R. to "Dr. Grain, Spine Specialist."

1014. Peter Grain, M.D. ("Grain") is a neurologist.

1015. D.R. returned to Elite Health again on July 10, 2013 for another established patient evaluation with Upfall.

1016. Upfall again reported that D.R. suffered pain in the same regions as reported on the May 29, 2013 visit.

1017. Therefore, according to Upfall's records, physical therapy and chiropractic were not alleviating D.R.'s symptoms.

1018. Nonetheless, Upfall recommended D.R. continue with physical therapy and chiropractic treatment.

1019. On July 22, 2013, D.R. presented to Prime Neurosurgery (another assumed name of Elite Health) for a consultation with Grain.

1020. On July 26, 2013, D.R. presented to Pain Specialist of Michigan (yet another assumed name of Elite Health) for an initial patient evaluation with Juska.

1021. In less than one (1) month, Elite Health billed Allstate for four (4) patient evaluations/consultations for D.R. under Elite Health and three (3) different assumed names: (1) Pioneer Neurology Group on July 2, 2013; (2) Elite Health on July 10, 2013; (3) Prime Neurosurgery on July 22, 2013; and (4) Pain Specialist of Michigan on July 26, 2013.

1022. By and through these assumed names, Elite Health attempted to make it appear as though D.R. received treatment from four (4) different clinics, when, in fact, all of the clinics were commonly owned.

1023. D.R. returned to Elite Health on September 11, 2013 for an established patient evaluation with Upfall.

1024. Upfall's medical records on September 11, 2013 are nearly identical to his records on July 10, 2013, including the same patient evaluation and treatment recommendations. *See* Exhibit 50.

1025. D.R. again returned to Elite Health on October 23, 2013 for an established patient evaluation with Upfall.

1026. Yet again, Upfall's records are practically identical to those from D.R.'s last visit on September 11, 2013. Id.

1027. D.R. underwent a total of 54 chiropractic and 41 physical therapy sessions, which was far in excess of the standard of care.

1028. D.R. received concurrent physical therapy and chiropractic treatment, which is unnecessary and in violation of the standard of care.

1029. In fact, D.R. allegedly received both chiropractic care and physical therapy on the same day on twenty (20) dates of service.

1030. Bittner Chiropractic and Elite Health both billed Allstate using CPT Code 97010—purporting to both apply a hot or cold pack to D.R.—on the same date seven (7) times.

1031. Bittner Chiropractic and Elite Health both billed Allstate using CPT Code 97110—claiming to supervise D.R.'s performance of therapeutic exercises—on the same date five (5) times.

1032. Bittner Chiropractic and Elite Health both billed Allstate using CPT Code 97140—alleging to both perform manual therapy on D.R.—on the same date one (1) time.

1033. Performing the same treatment modality to the same patient multiple times on the same date is in violation of the standard of care.

1034. Bittner Chiropractic, Elite Health, and Derek Bittner submitted claims for payment and accompanying medical records relative to D.R. to Allstate through

interstate wires and the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1035. Allstate is not required to pay Bittner Chiropractic, Elite Health, or Derek Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to D.R. and is entitled to the return of money paid to Bittner Chiropractic and Elite Health.

### 8.   Patient A. F. (Claim No. 0401743430)

1036. Patient A.F. was allegedly involved in a motor vehicle accident on February 11, 2016 and went to the emergency room the next day.

1037. A.F. presented to Midwest seven (7) days later on February 18, 2016 for an initial evaluation with defendant Nicole Bittner.

1038. According to Midwest and Nicole Bittner, A.F. complained of headaches, as well as pain in his neck, trapezius, left shoulder, mid back, low back, and buttocks.

1039. These complaints conflict with the emergency room records.

1040. Like almost every patient at issue in this Complaint, Midwest and Nicole Bittner found alleged spasms, tenderness, and trigger points in A.F.'s cervical, thoracic, and lumbar spine.

1041. Despite already receiving x-rays at the hospital, Nicole Bittner again ordered x-rays of A.F.'s cervical and lumbar spine.

1042. Nicole Bittner also ordered MRI scans of A.F.'s cervical and lumbar spine.

1043. These MRI scans were unnecessary considering the negative x-ray results.

1044. A.F. presented to Superior Imaging on March 29, 2016 for the MRI scans.

1045. A.F. also presented to Midwest on March 29, 2016 for an initial evaluation with Orlewicz pursuant to a referral by Nicole Bittner.

1046. According to Orlewicz's medical records, the emergency room told A.F. "to follow up with Dr. Bittner."

1047. However, the hospital records make no mention of A.F. following up with a chiropractor.

1048. Orlewicz's medical records also indicate that A.F. presented with headaches, and that A.F. began suffering from headaches immediately after the motor vehicle accident.

1049. This again conflicts with the emergency room records, which make no mention of A.F. suffering from headaches and indicate that A.F. denied any head injury.

1050. Furthermore, Orlewicz indicated that A.F.'s headaches were a seven (7) on a pain scale with one (1) being little to no pain and ten (10) being extreme pain.

1051. Orlewicz's pain levels for A.F. conflict with Nicole Bittner's records just the day before, documenting "slight" headaches, which equal a one (1), two (2), or three (3) on the pain scale.

1052. Nicole Bittner purportedly reviewed A.F.'s MRI scan results on April 26, 2016, nearly one (1) month after the scans were performed.

1053. However, Nicole Bittner proceeded to render the same treatment protocol that she allegedly provided prior to receipt of the MRI scan results.

1054. The MRI scans performed by Superior Imaging were therefore unnecessary because they had no effect on A.F.'s course of treatment.

1055. Nicole Bittner also referred A.F. to Velugubanti for a neurological evaluation.

1056. A.F. presented to Midwest on June 10, 2016 for the evaluation with Velugubanti.

1057. According to Velugubanti, A.F. suffered from headaches every two (2) to three (3) days of moderate intensity.

1058. This again conflicts with Nicole Bittner's medical records—which record A.F.'s headaches as slight—as well as the emergency room records from the day after the accident, where A.F. denied any head injury.

1059. Velugubanti immediately ordered an MRI scan of A.F.'s brain.

1060.  In violation of the standard of care, Velugubanti failed to document any significant neurologic signs and/or symptoms indicative of A.F. suffering from intracranial pathology.

1061.  A.F. returned to Superior Imaging on June 15, 2016 for the MRI scan.

1062.  Midwest never documented the results of A.F.'s MRI scan for his brain.

1063.  Therefore, the brain MRI scan had no effect on A.F.'s treatment protocol and was unnecessary.

1064.  Velugubanti also ordered an electroencephalogram ("EEG").

1065.  A.F. received an EEG from Midwest on June 23, 2016, and was "being evaluated for seizures."

1066.  A.F. has no history of seizures, and no physician or chiropractor at Midwest ever documented that A.F. suffered from or experienced seizures.

1067.  Indeed, Velugubanti specifically mentioned on June 10, 2016 that A.F. did not suffer from seizures.

1068.  Therefore, the EEG performed by Midwest was unnecessary.

1069.  A.F. received a total of 50 chiropractic sessions over the course of more than seven (7) months, from February 18, 2016 through September 27, 2016.

1070. Midwest, Superior Imaging, and Nicole Bittner submitted claims for payment and accompanying medical records relative to A.F. to Allstate through the

U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1071. Allstate is not required to pay Midwest, Superior Imaging, or Nicole Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to A.F. and is entitled to the return of money paid to Midwest.

### 9. Patient F.H. (Claim No. 0240671321)

1072. Patient F.H. was allegedly involved in a motor vehicle accident on March 31, 2012.

1073. F.H. did not go to the hospital following his motor vehicle accident.

1074. F.H. presented to Elite Chiropractic two (2) days later on April 2, 2012 to initiate chiropractic treatment with Derek Bittner.

1075. According to Elite Chiropractic and Derek Bittner, F.H. complained of headaches and pain in his neck, trapezius, both shoulders, mid-back, low back, buttocks, hip, and left knee.

1076. Like nearly every patient at issue in this Complaint, Derek Bittner found alleged spasms, tenderness, and trigger points in F.H.'s cervical, thoracic, and lumbar spine.

1077. Elite Chiropractic referred F.H. to Elite Health for pain management.

1078. F.H. presented to Elite Health on May 10, 2012 for an initial evaluation with Upfall.

1079. Elite Health and Upfall noted that F.H. suffered from severe pain in his upper, lower, and mid-back with pain radiating in his upper and lower extremities.

1080. This conflicts with the Elite Chiropractic records from the same week, which report F.H.'s pain as either slight or moderate.

1081. Upfall recommended F.H. continue his chiropractic treatment, and referred him for physical therapy.

1082. Upfall also stated, as per his template treatment records, that F.H. "is not to return to employment" despite the fact that Upfall previously noted that F.H. was retired.

1083. F.H. initiated physical therapy at Elite Rehab on June 26, 2012.

1084. F.H. received chiropractic care and physical therapy concurrently, which is medically unnecessary, redundant, and excessive.

1085. In fact, F.H. allegedly received both chiropractic care and physical therapy on the same day on twenty-one (21) dates of service.

1086. Elite Chiropractic and Elite Rehab both billed Allstate using CPT Code 97010—purporting to both apply a hot or cold pack to F.H.—on the same date twenty (20) times.

1087. Elite Chiropractic and Elite Rehab both billed Allstate using CPT Code 97110—claiming to supervise F.H.'s performance of therapeutic exercises—on the same date two (2) times.

1088. On at least five (5) dates of service, Elite Rehab billed Allstate using CPT Code 97110, and Elite Chiropractic billed Allstate using CPT Code 97150.

1089. CPT Code 97150 is the billing code used for the performance of therapeutic exercises in a group setting.

1090. In other words, CPT Codes 97110 and 97150 are the same treatment modality.

1091. Performing the same treatment modality to the same patient multiple times on the same date is medically unnecessary, redundant, and excessive.

1092. While undergoing chiropractic care and physical therapy, Upfall referred F.H. to see James.

1093. F.H. presented to Elite Health on September 22, 2012 for an initial evaluation with James.

1094. James noted that F.H. suffered "no relief of his pain at this time because he is not currently on any medications."

1095. However, this conflicts with Elite Rehab's records on September 12, 2012 noting "pain 1/10 at back, neck."

1096. James recommended that F.H. continue with chiropractic and physical therapy, and scheduled F.H. for steroid injections.

1097. On October 11, 2012, James performed a four (4)-level, bilateral, intra-articular facet injection.

1098. James did not inject a steroid, but instead injected a local anesthetic.

1099. By not injecting a steroid, the injection was of no therapeutic value.

1100. Elite Health also billed Allstate for facet joint arthrograms, which are of no clinical value.

1101. The arthrograms were noted to be normal, which indicates that they were useless examinations done for no purpose other than to bill Allstate for the procedure.

1102. James performed the procedure again two (2) weeks later—again without steroid which is of no clinical value.

1103. Elite Chiropractic, Elite Health, Elite Rehab, and Derek Bittner submitted claims for payment and accompanying medical records relative to F.H. to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1104. Allstate is not required to pay Elite Chiropractic, Elite Health, Elite Rehab, or Derek Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to F.H. and is entitled to the return of money paid to Elite Chiropractic, Elite Health, and Elite Rehab.

### 10.   Patient S.G. (Claim No. 0245366612)

1105. Patient S.G. was allegedly involved in a motor vehicle accident on May 17, 2012.

1106. S.G. presented to Elite Health on August 23, 2012 for an initial evaluation with Upfall.

1107. Upfall's records state that S.G. was seen "for consultation at the request of Dr. Riffini."

1108. However, S.G. never treated with a "Dr. Riffini."

1109. Upfall also noted that S.G. "has no headache at this time."

1110. Despite the absence of headaches, Upfall indicated that "[t]raumatic head injury will anticipate referral to neurologist an [sic] MRI of the brain."

1111. The immediate referral to a neurologist and an unnecessary MRI scan are further evidence of the defendants' predetermined protocol of internal referrals.

1112. S.G. presented to Elite Health on September 29, 2012 for an initial evaluation with James.

1113. James scheduled S.G. for lumbar transforaminal epidural steroid injections and trigger point injections.

1114. James also prescribed S.G. a large dose of opiates: four (4) milligrams of Dilaudid and 750 milligrams of Vicodin.

1115. There is no clinical reason to prescribe two (2) short-acting opiates at the same time, nor in such high doses.

1116. Elite Health's and James's pain medication prescriptions dangerously deviate from the standard of care.

1117. On October 20, 2012, James performed a bilateral single level transforaminal epidural steroid injection.

1118. S.G. never reported—and James never documented—pain in his right leg.

1119. Therefore, there was no medical need for a bilateral injection.

1120. Despite allegedly scheduling S.G. for trigger point injections, Elite Health and James never performed these injections.

1121. Generally, patients with myofascial/musculoskeletal pain receive trigger point injections as the first step.

1122. Elite Health immediately performed the epidural steroid injection in lieu of the trigger point injections because epidural steroid injections are billed at a much higher rate.

1123. James injected four (4) cubic centimeters of Bupivacaine, which is a large amount of local anesthetic.

1124. Injecting a local anesthetic—instead of a steroid—eliminates any diagnostic value for the injection.

1125. Furthermore, Elite Health and James performed this injection under anesthesia sedation, which is medically unnecessary.

1126. S.G. returned to Elite Health on November 15, 2012 for an established patient evaluation with Upfall.

1127. Upfall noted that S.G. received two (2) epidural "shots in the lower back," when, in fact, S.G. had only received one (1) injection to date.

1128. Moreover, Upfall failed to document S.G.'s response to the bilateral epidural steroid injection, confirming that the injection was medically unnecessary and performed solely to maximize the amount billed by the defendants.

1129. On January 19, 2013, Elite Health and James performed a three (3)-level bilateral facet joint injection.

1130. Elite Health and James again performed the procedure under anesthesia, which is medically unnecessary.

1131. Moreover, James again injected only a local anesthetic—Bupivacaine—which eliminates any diagnostic value for the injection.

1132. Elite Health and James also performed a lumbar facet joint arthrogram, which was medically unnecessary.

1133. S.G. returned to Elite Health on January 31, 2013 for another established patient evaluation with Upfall.

1134. Upfall noted that S.G. received three (3) epidural shots in the lower back; however, he failed to document S.G.'s response to any of the injections.

1135. Elite Health submitted claims for payment and accompanying medical records relative to S.G. to Allstate through the U.S. Mail and interstate wires seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1136. Allstate is not required to pay Elite Health for the fraudulent, unnecessary, and unreasonable treatment rendered to S.G. and is entitled to the return of money paid to Elite Health.

### 11.    Patient C.B. (Claim No. 0422917542)

1137. Patient C.B. was allegedly involved in a motor vehicle accident on July 25, 2016 and went to the emergency room that same day.

1138. C.B. presented to Midwest two (2) days later on July 27, 2016 for an initial evaluation with Nicole Bittner.

1139. According to Midwest and Nicole Bittner, C.B. complained of headaches as well as pain in his neck, trapezius, left shoulder, left wrist, mid-back, low back, left hip, and left knee.

1140. These complaints conflict with the emergency room records.

1141. Like almost every patient at issue in this Complaint, Midwest and Nicole Bittner found alleged spasms, tenderness, and trigger points in C.B.'s cervical, thoracic, and lumbar spine.

1142. Nicole Bittner ordered an MRI scan of C.B.'s lumbar spine.

1143. C.B. presented to Superior Imaging on September 6, 2016 for the MRI scan.

1144. Nicole Bittner never reviewed the lumbar spine MRI results.

1145. The lumbar spine MRI performed by Superior Imaging was therefore unnecessary because it had no effect on C.B.'s course of treatment.

1146. C.B. presented to Midwest on September 20, 2016 for an initial evaluation with Orlewicz pursuant to a referral by Nicole Bittner.

1147. According to Orlewicz's medical records C.B.'s presenting complaints included headaches, bilateral knee pain, and bilateral shoulder pain.

1148. This conflicts with the emergency room records, which make no mention of C.B. suffering from headaches, bilateral knee pain, or bilateral shoulder pain.

1149. Furthermore, Orlewicz noted that C.B. complained of bilateral knee pain at a ten (10), neck pain at a five (5) or six (6), and upper back/low neck pain at a nine (9) on a pain scale with one (1) being little to no pain and ten (10) being extreme pain.

1150. Orlewicz's pain levels for C.B. conflict with Nicole Bittner's records just the day before, documenting no complaints of headaches or knee pain, and rating his neck pain at a three (3) and his back pain as a two (2) out of ten (10).

1151. Orlewicz ordered MRI scans of C.B.'s cervical spine, thoracic spine, and left knee.

1152. C.B. returned to Superior Imaging on September 28, 2016 for the MRI scans.

1153. C.B. presented to Midwest on December 20, 2016 for an established patient evaluation with Orlewicz.

1154. Based upon the MRI scan results, Orlewicz recommended that C.B. "start some physical therapy and/or chiropractic care."

1155. However, C.B. had already undergone chiropractic care for nearly three (3) months at this time.

1156. The MRIs performed by Superior Imaging were therefore unnecessary because they had no effect on C.B.'s course of treatment.

1157. C.B. presented for an independent medical evaluation on January 31, 2017.

1158. C.B. told the independent medical evaluator that he was referred by an attorney to a chiropractor.

1159. Morse's firm represented C.B.

1160. Morse therefore referred C.B. to Midwest and Nicole Bittner.

1161. C.B. presented to Midwest on March 23, 2017 for the sole purpose of picking up his prescription medication.

1162. Midwest billed Allstate $100 for a Level One established patient evaluation.

1163. Midwest also billed Allstate $100 for Level One established patient evaluations on May 19, 2017 and July 14, 2017.

1164. The medical records for March 23, May 19, and July 14, 2017 state solely that "[t]he patient picked up his prescription today as indicated."

1165. Charging $100 for a patient to pick up medication that was already prescribed requires no medical decision-making or evaluation of the patient, rendering these charges abusive and entirely without basis.

1166. C.B. received a total of forty-six (46) chiropractic sessions over the course of more than ten (10) months, from July 27, 2016 to June 14, 2017.

1167. Midwest, Superior Imaging, and Nicole Bittner submitted claims for payment and accompanying medical records relative to C.B. to Allstate through the U.S. Mail seeking reimbursement for unnecessary and unreasonable treatment, upon which Allstate relied in adjusting the claims.

1168. Allstate is not required to pay Midwest, Superior Imaging, or Nicole Bittner for the fraudulent, unnecessary, and unreasonable treatment rendered to C.B. and is entitled to the return of money paid to Midwest and Superior Imaging.

## X.    **FRAUDULENT BILLING PRACTICES**

1169. Providers like Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, Derek Bittner, and Nicole Bittner have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1170. Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, Derek Bittner, and Nicole Bittner failed to meet this responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services, as discussed *supra*, and used fraudulent billing practices.

1171. The defendants submitted reimbursement claims to Allstate through the U.S. Mail and interstate wires on Health Insurance Claim Forms ("HICF") (also known as "CMS-1500" claim forms) approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

1172. The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing

any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1173. The defendants submitted reimbursement claims to Allstate containing CPT Codes seeking payment for physical therapy and chiropractic treatment purportedly performed.

1174. According to the Health Insurance Portability and Accountability Act ("HIPAA"), all healthcare providers are mandated to bill insurance carriers, including auto insurance carriers like Allstate, utilizing the HIPAA-defined standard transaction code sets (which, in the context of this Complaint, are the CPT Codes).

1175. Each provider has the responsibility to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

### A. FRAUDULENT PRACTICE OF UNBUNDLING

1176. The National Correct Coding Initiative ("NCCI") was established to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

1177. There are two (2) NCCI edit tables: "Column One/Column Two Correct Coding Edit Table" and "Mutually Exclusive Edit Table."

1178. Each NCCI edit table has a Column One and Column Two billing code.

1179. Each NCCI edit table contains edits, which are pairs of billing codes that cannot be reported together because the services (and reimbursement) for the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

1180. Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

1181. Each NCCI edit has a modifier indicator assigned to it.

1182. A modifier indicator of "0" indicates a modifier cannot be used to bypass the edit.

1183. A modifier indicator of "1" indicates that a properly-codified modifier can be used to allow submitted services or procedures if certain criteria are met.

1184. Many procedure codes cannot be reported together because they are mutually exclusive of each other and mutually exclusive procedures cannot be performed at the same anatomic site or during the same patient encounter.

1185. Pairs of billing codes that are mutually exclusive of one another are identified as code pair edits in the NCCI Mutually Exclusive edit table.

1186. For a significant number of the patients at issue in this Complaint, Bittner Chiropractic, Elite Chiropractic, Elite Rehab, Elite Health, and Midwest

submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for unbundled services billed on the same date of service, as detailed in Exhibit 51.

### 1. Modifier Indicator "0"

1187. Elite Chiropractic, Elite Rehab, and Midwest submitted bills to Allstate seeking payment for CPT Codes paired with other billing codes that have NCCI Modifier Indicator "0" listed.

1188. As discussed above, any CPT Code pairs with Modifier Indicator "0" listed means the CPT Codes can never be billed on the same date of service for the same patient under any circumstances.

1189. Elite Chiropractic, Elite Rehab, and Midwest routinely submitted bills to Allstate seeking payment for unbundled services.

1190. For each violation of the Column One and Column Two Edit Table, it is the procedure in Column Two that is unbundled from Column One and therefore is non-compensable.

1191. By way of example, Elite Chiropractic, Elite Rehab, and Midwest submitted bills to Allstate for CPT Code 97124 and CPT Code 97140 for the same patient on the same date of service.

1192. CPT Code 97124 is a Column Two code and CPT Code 97140 is a Column One code when billed on the same date of service for the same patient.

1193. As another example, Midwest submitted bills to Allstate for CPT Code 95851 (*"range of motion measurement and report (separate procedure); each extremity (excluding hand) or each trunk section (spine)"*) and CPT Code 98941 (*"chiropractic manipulative treatment (CMT); spinal, 3-4 regions"*) for the same patient on the same date of service.

1194. CPT Code 95851 is a Column Two code and CPT Code 98941 is a Column One code when billed on the same date of service for the same patient.

1195. Elite Chiropractic, Elite Rehab, and Midwest fraudulently unbundled charges with a modifier indicator of "0" to Allstate totaling over $31,241. *See* id.

1196. The billing tactics used by Elite Chiropractic demonstrate the steps taken to conceal the unbundled charges.

1197. Elite Chiropractic submitted bills to Allstate containing the CPT Codes charged for an individual date of service.

1198. These bills included a charge for CPT Code 97140 (the Column One code), but did not include a charge for CPT Code 97124 (the Column Two code).

1199. Then, several days later, Elite Chiropractic submitted bills to Allstate containing only CPT Code 97124 for that same date of service.

1200. The breadth, depth, and frequency of Elite Chiropractic's fraudulent billing confirms that these billing practices were intentional.

1201. Allstate is not obligated to pay Elite Chiropractic, Elite Rehab, or Midwest for fraudulently billed procedures.

### 2. Modifier Indicator "1"

1202. Bittner Chiropractic, Elite Chiropractic, Elite Rehab, Elite Health, and Midwest submitted bills to Allstate seeking payment for CPT Codes paired with other billing codes that have NCCI Modifier Indicator "1" listed.

1203. As discussed *supra*, any CPT Code pairs with a modifier indicator of "1" requires a properly codified modifier to demonstrate that the procedures were not performed at the same anatomic site.

1204. Bittner Chiropractic, Elite Chiropractic, Elite Rehab, Elite Health, and Midwest submitted bills to Allstate containing modifiers.

1205. However, the medical records for the billed services indicate that the medical providers failed to perform separate and distinct procedures.

1206. Indeed, as discussed *supra*, the medical records fail to indicate whether services were in fact rendered at all.

1207. Bittner Chiropractic, Elite Chiropractic, Elite Rehab, Elite Health, and Midwest therefore fraudulently included modifiers in an attempt to mask the fact that the unbundled services were in fact performed to the same anatomic site, if the services were rendered at all.

1208. Exhibit 51 identifies the CPT Codes charged by Bittner Chiropractic, Elite Chiropractic, Elite Rehab, Elite Health, and Midwest where the modifier is not supported.

1209. Additionally, Elite Chiropractic and Elite Rehab attempted to circumvent basic billing and coding rules by unbundling services and reporting the treatment by multiple entities.

1210. As discussed *supra*, Elite Chiropractic and Elite Rehab operated out of the same clinic location.

1211. Patients allegedly received treatment from both Elite Chiropractic and Elite Rehab on the same day at the same facility.

1212. Elite Chiropractic and Elite Rehab billed for services that required the use of a billing modifier if billed by the same company.

1213. For example, Elite Chiropractic consistently billed Allstate using CPT Code 98941 on the same day that Elite Rehab billed Allstate for services under CPT Code 97140 for the same patient.

1214. CPT Code 98941 is a Column One code and CPT Code 97140 is a Column Two code with a modifier indicator of "1."

1215. By billing for the services under two (2) distinct entities, Elite Chiropractic and Elite Rehab masked the truth: that these commonly-owned entities were in fact unbundling.

1216. Therefore, defendants Derek Bittner and Radom used these two (2) entities to avoid the appearance of the fraudulent billing practice of unbundling that they were committing by and through Elite Chiropractic and Elite Rehab.

1217. Allstate is not obligated to pay the defendants for fraudulently billed treatment.

### B.    FRAUDULENTLY UPCODED OFFICE VISITS

1218. Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

1219. It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1220. As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with the AMA's requirements, and/or (3) were wholly unwarranted and unnecessary.

1221. Moreover, the billing codes submitted to Allstate by, and on behalf of, Elite Health consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

1222. Most prominently, Elite Health submitted bills to Allstate seeking reimbursement for high-level office visits and office consultations that did not occur as billed.

1223. When an individual has been in a motor vehicle accident and complains of pain, a licensed healthcare professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.

1224. The licensed healthcare professional must also engage in medical decision making to design a legitimate treatment plan tailored to the unique needs of each patient.

1225. Examination, evaluation, and the establishment of a diagnosis are all part of the process that helps healthcare providers determine an appropriate treatment plan specifically designed to aid each individual patient's care, recovery, and rehabilitation.

1226. The evaluation and management of a patient is usually billed through CPT Codes for office visits/examinations or office consultations.

1227. A legitimate examination has three (3) components: (1) the patient history; (2) the systems review; and (3) tests and measures.

1228. The "patient history" is defined as a systematic gathering of past and current information related to why the patient is seeking medical services and includes data obtained (i.e., through an interview, a review of the patient's records,

or from other sources) from, among other things, family history, general health status, medical/surgical history, current conditions, and chief complaints.

1229. The "systems review" is an examination of the anatomical and physiological status of a patient's systems (e.g., cardiovascular/pulmonary, musculoskeletal, and neuromuscular systems).

1230. After an appropriate examination and questioning process, the healthcare provider determines the patient's needs, and generates diagnostic hypotheses that may be further investigated by utilizing specific tests and measures.

1231. "Tests and measures" are used to: (1) rule in (or rule out) causes of impairment and functional limitations; (2) establish a diagnosis, prognosis, and plan of care; and (3) select interventions.

1232. There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex.

1233. Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

1234. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

1235. The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| **99201** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99202** | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| **99203** | Detailed | Detailed | Low complexity | 30 minutes |
| **99204** | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| **99205** | Comprehensive | Comprehensive | High complexity | 60 minutes |

1236. Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

1237. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

1238. The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| **99211** | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| **99212** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99213** | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| **99214** | Detailed | Detailed | Moderate complexity | 25 minutes |
| **99215** | Comprehensive | Comprehensive | High complexity | 40 minutes |

1239. Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

1240. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

1241. The criteria developed by the AMA to properly assign the CPT Code for an initial consultation include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99241 | Problem focused | Problem focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

1242. The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| Straight forward decision making (CPT Code 99201-99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT Code 99203) | Limited | Limited | Low |

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

1243.  The AMA has published examples of office visits that are appropriately

billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

1244.  The AMA has published examples of office visits that are appropriately

billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion."

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

1245. The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

1246. The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

1247. The AMA has published examples of office visits that are appropriately billed using CPT Code 99245, including:

- "Initial office consultation of a 35-year-old multiple trauma male patient with complex pelvic fractures, for evaluation and formulation of management plan."

- "Office consultation for independent medical examination of a patient with a history of complicated low back and neck problems with previous multiple failed back surgeries."

*CPT 2015: Professional Edition Codebook.*

1248. The AMA has published examples of office visits that are appropriately billed using CPT Code 99244, including:

- "Initial office consultation for a patient with a failed total hip replacement with loosening and pain upon walking."

- "Office consultation for 66-year-old female, history of colon restriction for adenocarcinoma six years earlier, now with severe mid-back pain; X-rays showing osteoporosis and multiple vertebral compression fractures."

*CPT 2015: Professional Edition Codebook.*

1249. The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

1250. Instead, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints, to the extent patients had symptoms at all (as most patients presented because they were illegally solicited to do so and not because they sought out medical treatment).

1251. Soft-tissue injuries usually resolve themselves without medical intervention.

1252. Yet, Elite Health almost always billed Allstate for level four (4) and five (5) examinations for the initial office visit (i.e., CPT Codes 99204 and 99205) or initial office consultation (i.e., CPT Code 99244 and 99245).

1253. Elite Health almost always billed Allstate for level four (4) and five (5) examinations for the follow-up visits (i.e., CPT Codes 99214, and 99215).

1254. Elite Health billed Allstate for level four (4) and five (5) office visits and consultations more than eighty-seven percent (87%) of the time with respect to the patients at issue in this Complaint. *See* Exhibit 2.

1255. The documentation submitted by Elite Health to Allstate falls woefully short of meeting the threshold standard to bill for level four (4) or five (5) office visits, as it lacked documentation of the necessary history, examination, or complexity of medical decision making to rise to billing at level four (4) or five (5).

1256. Elite Health's own records demonstrate the billing for level four (4) and five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered.

1257. Indeed, these records, and the lack of detail and specificity therein, evidence that the physicians rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

1258. The records also demonstrate that Elite Health's patients, almost all of whom were involved in minor motor vehicle accidents and were fully ambulatory, rarely presented with serious symptoms and injuries.

1259. By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, Elite Health (including its owners and managers Derek Bittner, Radom, and D & M Management) represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

1260. However, all of the bills prepared and submitted by Elite Health (including its owners and managers Derek Bittner, Radom, and D & M Management) were submitted using fraudulent and deceptive examination CPT Codes.

1261. As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

### C.   IMPROPERLY SUBMITTING TIMED BILLING CODES

1262. Elite Health and Elite Rehab fraudulently billed Allstate using timed billing codes without providing the necessary documentation to support the charges.

1263. CPT Codes 97110, 97124, and 97140 are timed CPT Codes for which each unit billed represents fifteen (15) minutes of treatment.

1264. Each fifteen (15) minute unit of these CPT Codes requires a minimum of eight (8) defined minutes of treatment to be performed before a single unit can be properly billed.

1265. When multiple units of a timed CPT Code are billed, the second (and subsequent) unit requires the full fifteen (15) minutes for the first unit, followed by at least eight (8) minutes of the second unit.

1266. To properly bill for two (2) units of a timed CPT Code, at least twenty-three (23) minutes of treatment must be performed; for three (3) units, at least thirty-eight (38) minutes of treatment must be performed; and so on.

1267. Elite Health and Elite Rehab submitted charges to Allstate for alleged treatments without ever indicating on the medical records for how long the patients at issue in this Complaint purportedly received treatment.

1268. Elite Health and Elite Rehab simply listed the relevant codes on their medical records without indicating the amount of time for which treatment was rendered.

1269. For example, Elite Rehab submitted bills to Allstate representing that three (3) units of therapeutic exercise had been performed for Patient L.W. (Claim No. 0217689009) on June 7, 2012.

1270. However, the medical records from Elite Rehab on June 7, 2012 fail to document that L.W. performed therapeutic exercises for at least thirty-eight (38) minutes.

1271. In fact, the only mention of therapeutic exercises on June 7, 2012 is "Therapeutic ex.s including strengthening ex.s for bilat shoulder and bilat knee."

1272. Allstate is not required to compensate Elite Health or Elite Rehab for their fraudulent billing of timed CPT Codes.

## XI.  MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.  MISREPRESENTATIONS BY THE DEFENDANTS

1273. To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred for and provided were necessary within the meaning of the Michigan No-Fault Act, and that all treatment was lawfully and actually rendered.

1274. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

1275. Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

1276. Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

1277.   There are no less than fifteen (15) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.   The defendants billed Allstate for treatment and services that were not actually provided.   Bittner Chiropractic, Elite Chiropractic, and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) billed for chiropractic treatment that was never rendered to patients at issue in this Complaint.  Elite Health, and Elite Rehab (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) submitted bills to Allstate for physical therapy that was never rendered.  Elite Chiropractic and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) also billed Allstate for massage therapy that patients never received.

b.   Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) administered massage therapy, provided chiropractic treatment, and issued DME to and for patients at issue in this Complaint without the necessary licensure.  Allstate is not required under the Michigan No-Fault Act to compensate the defendants for unlawfully rendered services.

c.   The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.  The defendants utilized illegal unapproved police reports and runners to recruit patients to receive unnecessary treatment and personally sought out patients who did not require medical care.  The defendants' method of obtaining patients did not include considerations of medical necessity.  The defendants referred patients to commonly-owned entities that derived profit for themselves without regard for the necessity and lawfulness of medical treatment.

d.   The defendants used an unlawful predetermined treatment protocol, as indicated by the use of chiropractic and physical therapy over the course of numerous months and sometimes years without any change to the treatment plan, as well as the *pro forma* ordering of MRIs.  This predetermined protocol is also confirmed by the substantially similar treatment rendered to all patients at issue in this Complaint, including treatment plans that have no patient-specific considerations.   Finally, this predetermined protocol is confirmed by the words and email of defendant Derek Bittner.

e.   Almost all of the patients at issue in this Complaint had significant symptom magnification and differences in presentation of symptoms when compared to records from other providers.  The defendants magnified diagnoses in an attempt to justify unnecessary treatment.  The use of more severe diagnoses often preceded the use of invasive therapy by the defendants, thereby confirming that the defendants inflated symptoms and diagnoses to falsely justify aggressive and expensive treatment.

f.   Elite Health and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) indiscriminately referred patients for physical therapy without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment.

g.   Elite Health and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) subjected their patients to a battery of unnecessary injections and other injection-related procedures in violation of applicable standards of care.  Allstate is not required to pay the defendants for medically unnecessary injections and procedures that were only recommended and performed to bolster claims submitted to Allstate.

h.   Midwest referred patients for MRIs, and Superior Imaging performed MRIs, that were medically unnecessary and performed only in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

i.  Superior Imaging (by and through its owners and managers—Derek Bittner, Radom, and D & M Management) submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at the outset of treatment and were excessive in number.

j.  Superior Imaging (by and through its owners and managers—Derek Bittner, Radom, and D & M Management) submitted bills to Allstate for MRIs that were medically unnecessary and failed to adhere to applicable standards of care, including ACR guidelines.  Superior Imaging routinely performed MRIs that lacked any supporting examination or neurologic test findings. It was the defendants' responsibility to confirm the need for MRIs pursuant to the ACR guidelines before performing the same.

k.  Elite Chiropractic and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) rendered massage therapy that was entirely unnecessary and provided based not on the clinical needs of the patient, but rather based upon the patient's request to receive a massage.

l.  Elite Health, Elite Chiropractic, and Elite Rehab (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) fraudulently submitted claims for payment to Allstate for alleged services that were also billed by different medical providers for the exact same purported treatment.

m.  Elite Health (by and through its owners and managers—Derek Bittner, Radom, and D & M Management) fraudulently upcoded office visits, as almost every single office visit billed to Allstate was for level four (4) or level five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels.   When done intentionally, upcoding constitutes a fraudulent billing practice.

n.  Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, and Midwest (by and through their owners and managers—Derek Bittner, Radom, and D & M Management)

submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

o.    Elite Health and Elite Rehab (by and through their owners and managers—Derek Bittner, Radom, and D & M Management) charged Allstate through the use of time-based CPT codes; however, the medical records failed to identify the amount of time that the patients allegedly received treatment, which is a fraudulent billing practice.

1278. The foregoing facts—billing for services not rendered, providing unlicensed services, unlawfully soliciting patients, falsifying diagnoses to justify excessive treatment, and misrepresenting the necessity of procedures performed on submitted bills—were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

1279. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unnecessary and unlawful.

1280. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed hereto at Exhibits 1 through 6.

1281. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the

treatment underlying the claim was not lawful and medically necessary (if performed at all), as it must be in order to be compensable under Michigan law.

1282. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1283. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, injections, MRIs, procedures, and ancillary services for which they billed Allstate.

1284. As the defendants did not render lawful and reasonably necessary medical treatment, and misrepresented the services purportedly performed, each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

1285. As licensed medical professionals, Derek Bittner and Nicole Bittner were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

1286. Each misrepresentation made by Derek Bittner and Nicole Bittner was in violation of their legal and ethical obligations as healthcare professionals

**B.   ALLSTATE'S JUSTIFIABLE RELIANCE**

1287. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

1288. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of medical services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the Michigan No-Fault Act.

1289. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment and transportation services in order to seek reimbursement under Michigan's No-Fault Act.

1290. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

1291. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and

could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

1292. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

1293. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

1294. As a result, Allstate has paid in excess of $763,951 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XII.    MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

1295. As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed, to the extent that they were performed at all.

1296. The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 6, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, and also because the defendants engaged in fraudulent billing practices.

1297. This objective necessarily required the submission of claims for reimbursement to Allstate.

1298. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail things to be sent and delivered by the U.S. Postal Service or sent through interstate wires.

1299. All documents, medical records, notes, reports, bills/HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires and/or the U.S. Mail.

1300. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

1301. Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

1302. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefit payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate for filing.

1303. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including payment of fraudulent bills via checks mailed by Allstate.

1304. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

1305. The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

1306. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 52.

1307. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

1308. It was within the ordinary course of business for Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, and Superior Imaging to submit claims for No-Fault reimbursement to insurance carriers like Allstate through interstate wires and the U.S. Mail.

1309. Moreover, the business of providing medical services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking

reimbursement to which each defendant clinic is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

1310. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendant clinics.

1311. The defendant clinics, at the direction and with the knowledge of Derek Bittner, Radom, and D & M Management, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

1312. Thus, the defendants' instances of mail and wire fraud continue.

1313. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1314. As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

1315. Allstate reasonably relied on the submissions it received from Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, and Superior

Imaging (by and through their Derek Bittner, Radom, and D & M Management), including the representative submissions set out in Exhibit 52 annexed hereto and identified in the exemplar claims above.

1316. As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.   DAMAGES

1317. The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

1318. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $763,951.

1319. Exhibits 53 through 58 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, payee, patient claim number, check number, and amount.

1320. Exhibit 53 details payments made by Allstate to Bittner Chiropractic since 2010.

1321. Exhibit 54 details payments made by Allstate to Elite Health since 2011.

1322. Exhibit 55 details payments made by Allstate to Elite Chiropractic since 2014.

1323. Exhibit 56 details payments made by Allstate to Elite Rehab since 2012.

1324. Exhibit 57 details payments made by Allstate to Midwest since 2014.

1325. Exhibit 58 details payments made by Allstate to Superior Imaging since 2015.

1326. Every claim identified in Exhibits 53 through 58 derives from an Allstate insurance policy.

1327. Allstate's claim for compensatory damages, as set out in Exhibits 53 through 58, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

1328. Every payment identified in Exhibits 53 through 58 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 53 through 58.

1329. Moreover, every payment identified in Exhibits 53 through 58 derives from a check sent by Allstate to the defendants through the U.S. Mail.

1330. As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records

and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

1331. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims submitted by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

1332. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Bittner Chiropractic Enterprise)
#### Against Elite Health Centers, Inc. and Derek Bittner, D.C.

1333.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1334.  Bittner Chiropractic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1335. In connection with each of the claims identified in the within Complaint, Elite Health Centers, Inc. and Derek Bittner, D.C. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Bittner Chiropractic, or knew that such false medical documentation would be

faxed and mailed in the ordinary course of Bittner Chiropractic's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Bittner Chiropractic would occur, in furtherance of the Count I defendants' scheme to defraud.

1336. The Count I defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1337. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1338. Policies of insurance were delivered to insureds through the U.S. Mail.

1339. Payments to Bittner Chiropractic from Allstate were transmitted through the U.S. Mail.

1340. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Bittner Chiropractic, which they knew would be billed by Bittner Chiropractic in order to collect payment from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1341. Elite Health referred patients to Bittner Chiropractic for treatment that Bittner Chiropractic billed Allstate.

1342. Derek Bittner owns and controls Bittner Chiropractic.

1343. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Bittner Chiropractic for the benefit of the Count I defendants that would not otherwise have been paid.

1344. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

1345. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1346. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Bittner Chiropractic for the benefit of the Count I defendants.

1347. The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1348. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

1349. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1350. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1351. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1352. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Bittner Chiropractic Enterprise)
### Against Elite Health Centers, Inc. and Derek Bittner, D.C.

1353. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1354. Elite Health Centers, Inc. and Derek Bittner, D.C. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Bittner Chiropractic.

1355. The Count II defendants each agreed to further, facilitate, support, and operate the Bittner Chiropractic enterprise.

1356. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

1357. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Bittner Chiropractic even though Bittner Chiropractic was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1358. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1359. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

1360. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims

submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Elite Health Enterprise)
### Against Derek L Bittner D.C., P.C., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1361.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1362. Elite Health constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1363. In connection with each of the claims identified in the within Complaint, Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic, Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Elite Health, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Elite Health's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Elite Health would occur, in furtherance of the Count III defendants' scheme to defraud.

1364.  The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on

certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1365. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1366. Policies of insurance were delivered to insureds through the U.S. Mail.

1367. Payments to Elite Health from Allstate were transmitted through the U.S. Mail.

1368. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Elite Health, which they knew would be billed by Elite Health in order to collect payment from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1369. Derek Bittner and Radom, by and through D & M Management, controlled and managed Elite Health.

1370. Bittner Chiropractic, Elite Chiropractic, Derek Bittner, and Nicole Bittner referred patients to Elite Health for treatment that Elite Health billed Allstate.

1371. Elite Rehab perpetuated unnecessary and unreasonable physical therapy treatment for months, including referring patients to Elite Health in order to obtain fraudulent physical therapy prescriptions in order to continue that treatment.

1372. Derek Bittner was the President of Elite Health.

1373. Radom was the Vice President of Elite Health.

1374. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Elite Health for the benefit of the Count III defendants that would not otherwise have been paid.

1375. The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

1376. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1377.  The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Elite Health for the benefit of the Count III defendants.

1378.  The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1379.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

1380.  The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1381.  Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1382.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1383.  By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Elite Health Enterprise)
### Against Derek L Bittner D.C., P.C., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1384. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1385. Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Elite Health.

1386. The Count IV defendants each agreed to further, facilitate, support, and operate the Elite Health enterprise.

1387. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

1388. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Elite Health even though Elite Health was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1389. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

1390. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

1391. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Elite Chiropractic Enterprise)**
**Against Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

1392. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1393. Elite Chiropractic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1394. In connection with each of the claims identified in the within Complaint, Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count V defendants") intentionally caused to be prepared, faxed, and

mailed false medical documentation by Elite Chiropractic, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Elite Chiropractic's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Elite Chiropractic would occur, in furtherance of the Count V defendants' scheme to defraud.

1395. The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1396. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1397. Policies of insurance were delivered to insureds through the U.S. Mail.

1398. Payments to Elite Chiropractic from Allstate were transmitted through the U.S. Mail.

1399. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Elite Chiropractic, which they knew would be billed by Elite Chiropractic in order

to collect payment from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1400. Elite Health referred patients to Elite Chiropractic for treatment that Elite Chiropractic billed Allstate.

1401. Derek Bittner and Radom controlled and managed Elite Chiropractic.

1402. Derek Bittner was the President of Elite Chiropractic.

1403. Derek Bittner and Nicole Bittner rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Elite Chiropractic.

1404. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Elite Chiropractic for the benefit of Elite Chiropractic and the Count V defendants that would not otherwise have been paid.

1405. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

1406. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1407. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Elite Chiropractic for the benefit of Elite Chiropractic and the Count V defendants.

1408. The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1409. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

1410. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1411. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1412. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1413. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted,

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Elite Chiropractic Enterprise)**
**Against Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and**
**Nicole Bittner, D.C.**

1414. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1415. Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Elite Chiropractic.

1416. The Count VI defendants each agreed to further, facilitate, support, and operate the Elite Chiropractic enterprise.

1417. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1418. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Elite Chiropractic even though Elite Chiropractic was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1419. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

1420. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

1421. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Elite Rehab Enterprise)**
**Against Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom**

1422. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1423. Elite Rehab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1424. In connection with each of the claims identified in the within Complaint, Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom ("Count VII defendants") intentionally caused to be

prepared, faxed, and mailed false medical documentation by Elite Rehab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Elite Rehab's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Elite Rehab would occur, in furtherance of the Count VII defendants' scheme to defraud.

1425. The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1426. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through interstate wires and the U.S. Mail.

1427. Policies of insurance were delivered to insureds through the U.S. Mail.

1428. Payments to Elite Rehab from Allstate were transmitted through the U.S. Mail.

1429. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by Elite Rehab, which they knew would be billed by Elite Rehab in order to

collect payment from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1430. Elite Health referred patients to Elite Rehab for treatment that Elite Rehab billed Allstate.

1431. Derek Bittner and Radom, by and through D & M Management, controlled and managed Elite Rehab.

1432. Derek Bittner was the President of Elite Rehab.

1433. Radom was the Vice President of Elite Rehab.

1434. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Elite Rehab for the benefit of the Count VII defendants that would not otherwise have been paid.

1435. The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

1436. By faxing or mailing, or agreeing that interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1437. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Elite Rehab for the benefit of the Count VII defendants.

1438. The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1439. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

1440. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1441. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1442. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1443. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted,

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Elite Rehabilitation Enterprise)
### Against Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom

1444. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1445. Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Elite Rehab.

1446. The Count VIII defendants each agreed to further, facilitate, support, and operate the Elite Rehab enterprise.

1447. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1448. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Elite Rehab even though Elite Rehab was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1449. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1450. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

1451. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Midwest Enterprise)
**Against Superior Diagnostics, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

1452. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1453. Midwest constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1454. In connection with each of the claims identified in the within Complaint, Superior Diagnostics, Inc. d/b/a Superior Imaging, D & M Management,

LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by Midwest, or knew that such false medical documentation would be mailed in the ordinary course of Midwest's business, or should have reasonably foreseen that the mailing of such false medical documentation by Midwest would occur, in furtherance of the Count IX defendants' scheme to defraud.

1455. The Count IX defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1456. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1457. Policies of insurance were delivered to insureds through the U.S. Mail.

1458. Payments to Midwest from Allstate were transmitted through the U.S. Mail.

1459. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Midwest, which they knew would be billed by Midwest in order to collect payment

from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1460. Superior Imaging performed unnecessary and unreasonable MRI scans that were used to perpetuate and justify fraudulent treatment at Midwest.

1461. Derek Bittner and Radom, by and through D & M Management, controlled and managed Midwest.

1462. Nicole Bittner rendered and facilitated the unlawful and medically unnecessary treatment at Midwest.

1463. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Midwest for the benefit of the Count IX defendants that would not otherwise have been paid.

1464. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

1465. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1466. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Midwest for the benefit of the Count IX defendants.

1467. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1468. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

1469. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1470. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1471. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1472. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Midwest Enterprise)
### Against Superior Diagnostics, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1473. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1474. Superior Diagnostics, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Midwest.

1475. The Count X defendants each agreed to further, facilitate, support, and operate the Midwest enterprise.

1476. As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1477. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Midwest even though Midwest was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1478. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1479. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1480. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Superior Imaging Enterprise)
### Against Midwest Medical Associates, Inc., D &M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1481. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1482. Superior Imaging constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1483. In connection with each of the claims identified in the within Complaint, Midwest Medical Associates, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by Superior Imaging, or knew that such false medical documentation would be mailed

in the ordinary course of Superior Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Superior Imaging would occur, in furtherance of the Count XI defendants' scheme to defraud.

1484. The Count XI defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 52.

1485. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1486. Policies of insurance were delivered to insureds through the U.S. Mail.

1487. Payments to Superior Imaging from Allstate were transmitted through the U.S. Mail.

1488. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Superior Imaging, which they knew would be billed by Superior Imaging in order to collect payment from Allstate under the personal injury protection benefits portion of Allstate policies and applicable provisions of the Michigan No-Fault Act.

1489. Midwest and Nicole Bittner referred patients to Superior Imaging for MRI scans that Superior Imaging billed to Allstate.

1490. Derek Bittner and Radom, by and through D & M Management, controlled and managed Superior Imaging.

1491. Derek Bittner is the President of Superior Imaging.

1492. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Superior Imaging for the benefit of the Count XI defendants that would not otherwise have been paid.

1493. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue his fraudulent scheme without detection.

1494. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1495. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Superior Imaging for the benefit of the Count XI defendants.

1496. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1497. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendant's fraudulent acts.

1498. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1499. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1500. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1501. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Superior Imaging Enterprise)
### Against Midwest Medical Associates, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1502. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1503. Midwest Medical Associates, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Superior Imaging.

1504. The Count XII defendants each agreed to further, facilitate, support, and operate the Superior Imaging enterprise.

1505. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1506. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Superior Imaging even though Superior Imaging was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1507. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1508. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1509. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## COMMON LAW FRAUD
### Against All Defendants

1510. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1511. The scheme to defraud Allstate perpetrated by Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc. d/b/a Superior Imaging, D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count XIII defendants") was dependent upon a succession of material misrepresentations of fact that the

defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1512. The misrepresentations of fact made by the Count XIII defendants include, but are not limited to, those material misrepresentations discussed in section XI, *supra*.

1513. The Count XIII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1514. The misrepresentations were intentionally made by the Count XIII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

1515. The Count XIII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1516. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1517. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XIV
## CIVIL CONSPIRACY
## Against All Defendants

1518. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1519. Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc. d/b/a Superior Imaging, D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count XIV defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, and (3) the defendants did not lawfully render treatment.

1520. The Count XIV defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1521. This purpose was known to all of the Count XIV defendants and intentionally pursued.

1522. Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, and because treatment was not lawfully rendered, the Count XIV defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1523. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1524. All of the Count XIV defendants directly benefited from the payments made to Bittner Chiropractic, Elite Health, Elite Chiropractic, Elite Rehab, Midwest, and Superior Imaging.

1525. All of the Count XIV defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XIV defendants in the commission of acts done for the benefit of all Count XIV defendants and to the unjustified detriment of Allstate.

1526. Accordingly, all of the Count XIV defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XV
## PAYMENT UNDER MISTAKE OF FACT
### Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc.

1527. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1528. Allstate paid the amounts described herein and itemized in Exhibits 53 through 58 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc. d/b/a Superior Imaging ("Count XV defendants").

1529. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XV defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1530. The Count XV defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1531. Allstate is entitled to restitution from each of the Count XV defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XVI
## UNJUST ENRICHMENT
### Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc.

1532. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1533. Allstate paid monies, including those amounts set out in Exhibits 53 through 58, in response to the claims submitted, or caused to be submitted, by defendants Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc. d/b/a Superior Imaging ("Count XVI defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1534. Allstate's payments constitute a benefit which the Count XVI defendants aggressively sought and voluntarily accepted.

1535. The Count XVI defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1536. The Count XVI defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

1537. The Count XVI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

1538. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1332 set forth above as if fully set forth herein.

1539. Derek L Bittner D.C., P.C. d/b/a Bittner Chiropractic Center, Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc. d/b/a Superior Imaging, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C. ("Count XVII defendants") routinely provided unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1540. The Count XVII defendants billed for chiropractic treatment, physical therapy, and massage therapy that was never actually provided.

1541. Bittner Chiropractic, Elite Chiropractic, Elite Rehab, and Midwest issued DME without the necessary license from the State of Michigan, thereby rendering its issuance of DME unlawful within the meaning of the No-Fault Act.

1542. Elite Chiropractic rendered chiropractic treatment by an unlicensed chiropractor, thereby rendering its services unlawful within the meaning of the No-Fault Act.

1543. Elite Chiropractic and Midwest rendered massage therapy by unlicensed massage therapists, thereby rendering their services unlawful within the meaning of the No-Fault Act.

1544. The Count XVII defendants solicited patients for medically unnecessary treatment and then rendered the treatment pursuant to a fraudulent scheme whereby patients were referred within the fraudulent network to commonly-owned entities for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

1545. The Count XVII defendants rendered unreasonable and unnecessary treatment pursuant to a predetermined protocol that included excessive chiropractic treatment, physical therapy, injections, MRI scans, and massage therapy.

1546. The Count XVII defendants engaged in fraudulent billing practices, including unbundling, upcoding office visits, and improperly billing for timed CPT Codes.

1547. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment

arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

1548. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

1549. The lack of lawfully-rendered treatment (such as treatment arising from illicit solicitation) is also a defense to an insurer's obligation to pay No-Fault benefits.

1550. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1551. The Count XVII defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1552. The Count XVII defendants will continue to bill Allstate for No- Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XVII defendants for any or all of the reasons set out in the within Complaint.

1553. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants provided unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

1554. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants were engaged in a fraudulent scheme whereby they provided unnecessary and unlawful treatment and engaged in fraudulent billing practices for the same to Allstate at all relevant times.

1555. As such, the Count XVII defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1556. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Bittner Chiropractic Enterprise)
### Against Elite Health Centers, Inc. and Derek Bittner, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Bittner Chiropractic Enterprise)
### Against Elite Health Centers, Inc. and Derek Bittner, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Elite Health Enterprise)
### Against Derek L Bittner D.C., P.C., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Elite Health Enterprise)
### Against Derek L Bittner D.C., P.C., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Elite Chiropractic Enterprise)
**Against Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Elite Chiropractic Enterprise)
**Against Elite Health Centers, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Elite Rehab Enterprise)
### Against Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Elite Rehab Enterprise)
### Against Elite Health Centers, Inc., D & M Management, LLC, Derek Bittner, D.C., and Mark Radom

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Midwest Enterprise)
**Against Superior Diagnostics, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Midwest Enterprise)
**Against Superior Diagnostics, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Superior Imaging Enterprise)
### Against Midwest Medical Associates, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Superior Imaging Enterprise)
### Against Midwest Medical Associates, Inc., D & M Management, LLC, Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XIII**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT XIV**
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XV
### PAYMENT UNDER MISTAKE OF FACT
**Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVI
### UNJUST ENRICHMENT
**Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., and Superior Diagnostics, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C.**

(a)     DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc., Derek Bittner, D.C.,

Mark Radom, and Nicole Bittner, D.C. for any or all of the reasons set out in the within Complaint; and

(b)   DECLARE that Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)   DECLARE that Derek L Bittner D.C., P.C., Elite Health Centers, Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Superior Diagnostics, Inc., Derek Bittner, D.C., Mark Radom, and Nicole Bittner, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)   GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.   <u>JURY TRIAL DEMAND</u>

The plaintiffs hereby demand a trial by jury on all clams.

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
Adam G. Gutbezahl
agutbezahl@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Property and Casualty*
*Insurance Company, and*
*Allstate Fire and Casualty Insurance*
*Company*

Dated: November 8, 2018